UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

No. \_\_\_\_

EZEQUIEL ARROYO,

Petitioner

v.

**05 11277 DPW**

BERNARD BRADY,
as he is SUPERINTENDENT OF OLD COLONY CORRECTIONAL CENTER,

Respondent.

---

**PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254**

---

DONALD A. HARWOOD, ESQ.
BBO# 225110
305 Broadway
New York, NY  10007
(212) 822-1400

## Preliminary Statement

This Opening Memorandum of Law is respectfully submitted by the Petitioner, Ezequiel Arroyo ("Petitioner" or "Arroyo"), in support of his accompanying petition for habeas corpus relief under 28 U.S.C. § 2254, with respect to his state court murder conviction returned on January 24, 2002, following a jury trial in the Suffolk Superior Court, Boston, Massachusetts, Spurlock, J., presiding.

Petitioner was convicted of murder in the first degree of one Luis Rivera, who died from gunshot wounds on May 19, 1998; Petitioner was also convicted of assault and battery with a dangerous weapon upon Marie LaBranche and unlawful possession of a firearm.

Petitioner's conviction was affirmed in a written decision by the Massachusetts Supreme Judicial Court on June 25, 2004 ("Decision": Addendum "A"). A petition for rehearing was denied on July 21, 2004. Hence, the within petition is timely filed with this Court under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA").

## ARGUMENT

### A. *Standard of Review*

The standard of review to be applied is set forth

by Congress in the Anti-Terrorism and Effective Death

Penalty Act of 1996 ("AEDPA"). AEDPA provides that in

a habeas proceeding, "a determination of a factual

issue made by a State court shall be presumed to be

correct," and the petitioner has the burden of

rebutting the presumption of correctness by clear and

convincing evidence.  28 U.S.C. § 2254(e)(1).

A state court's ultimate conclusions, including

its legal rulings, are reviewed pursuant to another

clause of AEDPA, allowing habeas relief where the

state court's adjudication:

> (1)  resulted in a decision that was
> contrary to, or involved an unreasonable
> application of, clearly established Federal
> law, as determined by the Supreme Court of
> the United States; or
>
> (2)  resulted in a decision that was based
> on an unreasonable determination of the
> facts in light of the evidence presented in
> the State court proceeding.

28 U.S.C. §2254(d); Coombs v. State of Maine, 202 F.3d

at 18. "This provision governs not only pure issues of

law, but mixed questions of law and fact in which

legal principles are applied to historical facts."

Id., citing Trice v. Ward, 196 F.3d 1151, 1169 (10th Cir. 1999).

In this context, the Supreme Court recently made clear in Williams v. Taylor, 529 U.S. 362, 389 (2000):

> . . .[T]he statute [AEDPA] directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law. If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody. . .violates the Constitution, that independent judgment should prevail.

Id. at 389.

As fully set forth below, Petitioner has demonstrated in this case that the state court's adjudication of his due process claims regarding the sufficiency of the evidence and the prosecutor's improper summation, the illegal seizure of Petitioner's blood sample, and, the admission of expert testimony and DNA evidence without a Daubert hearing, were "contrary to" or involved an "unreasonable application" of clearly established Supreme Court law, and/or constituted an "unreasonable determination of the facts" in light of the evidence adduced in the state court proceeding. 28 U.S.C.

§2254(d); Williams v. Taylor, 529 U.S. at 399.

I. **THE STATE COURT DECISION IS CONTRARY TO CLEARLY ESTABLISHED FEDERAL LAW BECAUSE IT ERRONEOUSLY DENIED PETITIONER'S MOTIONS FOR REQUIRED FINDING OF NOT GUILTY BECAUSE THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH HIS GUILT BEYOND A REASONABLE DOUBT, AND THUS, THE CONVICTIONS VIOLATE DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS.**

"The Due Process Clause of the Fourteenth Amendment 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Francis v. Franklin, 471 U.S. 307, 313 (1985), quoting In re Winship, 397 U.S. 358, 364 (1970). Commonwealth v. Salemme, 395 Mass. 594 (1985).

In deciding a motion for required finding of not guilty, a court must, "consider the evidence in the light most favorable to the Commonwealth to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Commonwealth v. Cordle, 412 Mass. 172, 175 (1992); Jackson v. Virginia, 443 U.S. 307, 319 (1979).

However, "it is not enough for the appellate court to find that there was some record evidence, however slight, to support each essential element of

the offense." Commonwealth v. Latimore, 378 Mass.
671, 677 (1979). No essential elements of the crime
may rest "in surmise, conjecture, or guesswork,"
Commonwealth v. Kelly, 359 Mass. 77, 88 (1971), or the
"piling of inference upon inference. . . ."
Commonwealth v. Ferguson, 384 Mass. 13, 18 (1981).

Here, the trial court erroneously denied
Petitioner's motions for required of not guilty. The
Commonwealth's evidence was insufficient to establish
the defendant's guilt beyond a reasonable doubt. None
of the witnesses to the crime identified Petitioner as
the assailant, nor was there any forensic evidence at
the scene, such as fingerprint or blood evidence,
which established Petitioner's guilt. Indeed, none of
the civilian witnesses to the crime, including Donna
Dewar, Norma Serrano, Helen Fitzpatrick and John
Alves, was even asked whether they could identify the
defendant as the assailant who fled from the scene.

At most, the Commonwealth presented evidence
that a green jacket, which was recovered by police
along a fence on Virginia Street a substantial
distance from the crime scene at 547 Columbia Road,
contained blood which fit the DNA profile of Arroyo,
thereby indicating he was a *possible* source of the

5

blood. However, the green jacket was never identified
as having belonged to the defendant or been worn by
him, nor was it ever positively identified as having
been worn by the assailant. Donna Dewar identified a
police photograph of a green jacket lying next to a
fence as only being "pretty similar" to the jacket she
saw on the man who ran away from the scene (Trial
Transcript, Volume Two, pages 43, 47, hereinafter
"T.II/43,47"); given this equivocal response, the
Commonwealth did not dare ask Dewar whether she could
actually identify the green jacket in the courtroom.
The other witnesses, Norma Serrano, Helen Fitzpatrick,
and John Alves, were never asked to identify the green
jacket at all. Nor was the jacket ever tested for
gunpowder residue to either confirm or deny the
possibility of its use by the shooter. Indeed, this
dearth of any identifying evidence mandated the
exclusion of the jacket as evidence at the trial.

    Moreover, there was no evidence from which to
infer that the blood allegedly found on the green
jacket was not already on the jacket prior to May 19,
1998, the date of the shooting; in this regard, there
was no evidence that the shooter would have bled on
the jacket since no one saw any blood on the jacket

that day, nor on the path of his flight from the
scene.   There was also no evidence that Petitioner had
any cuts or scrapes on or about May 19, 1998.

For that matter, descriptions of the assailant's
jacket varied, with some describing it as green while
others said it was blue; the police radio description
referred to the jacket as either "green or blue."
Likewise, descriptions of the assailant greatly
varied, with some witnesses describing him as:  (i)
"white" while others said he was "possibly Hispanic";
(ii) as short (5'3") or tall (6 feet); (iii) "husky"
or "skinny"; (iv) wearing brown corduroys or blue
jeans; and, (v) wearing a black baseball cap or
nothing at all on his head.   Discrepancies like these
cast grave doubt on the conviction.

Nor was there any ballistics testimony
connecting the defendant to the crime.   Although the
Commonwealth presented testimony from Carmen Torres --
a person of dubious past and motive -- that the
defendant owned a 9mm handgun, the Commonwealth never
presented police or expert ballistician testimony at
the trial that the five (5) spent casings recovered at
the crime scene were 9mm shells.   Moreover, none of

7

the spent casings were subjected to fingerprint
testing.

Accordingly, the trial court should have entered
required findings of not guilty on all of the
indictments alleging murder (Luis Rivera), assault and
battery with a handgun (of Marie LaBranche), and
possession of a firearm, including because the gun and
its operability were never established by the
Commonwealth at the trial as required by statute (see
G.L.c. 140 section 121).  The defendant's conviction
is unreliable, and hence, violative of federal due
process.  Francis v. Franklin, 471 U.S. at 313;
Jackson v. Denno, 378 U.S. 368, 376 (1964) (due
process violated if conviction is founded upon
incompetent evidence).

## II.   THE PROSECUTOR'S IMPROPER SUMMATION
       VIOLATED DUE PROCESS OF LAW.

The prosecutor "may strike hard blows, [but] he
is not at liberty to strike foul ones.  It is as much
his duty to refrain from improper methods calculated
to produce a wrongful conviction as it is to use every
legitimate means to bring about a just one."  Berger
v. United States, 295 U.S. 78, 88 (1935).

The "relevant question is whether the

8

prosecutor's comments 'so infected the trial with
unfairness as to make the resulting conviction a
denial of due process.'" Darden v. Wainright, 477
U.S. 168, 181 (1986), quoting Donnelly v.
DeChristoforo, 416 U.S. 637, 643 (1974).

Here, in commenting upon the Petitioner's DNA
profile in connection with the green jacket, the
prosecutor made the following prejudicial comments
not based upon any evidence adduced at trial. See,
e.g., United States v. Smith, 982 F.2d 681, 682 (1st
Cir. 1993) (improper for prosecutor to refer to or rely
upon matters not in evidence). The prosecutor stated:

> There is no disputing the blood on the
> jacket fits the defendant's DNA profile.
> The profile is very rare, as well. If you
> look at Mr. Arroyo as white, the profile
> shows that DNA profile only occurs once in
> every 75,000 people. If you look at
> Southeastern Hispanic, the numbers are even
> higher. One out of 81,000 people.
>
> Now, let's assume, --look at the number of
> people who live in Boston. Six hundred
> thousand people or so, give or take. Let's
> assume there are eight white people with
> that DNA profile, given those numbers. We
> assume half the people in Boston are white.
> Eight.
>
> What else can we assume about that general
> population of people in Boston who are white
> and have that DNA profile? How many guys
> fit that profile? Well, forget about the
> black guys, ladies and gentleman, because
> the shooter wasn't black. The shooter's

description isn't black according to any
reliable witness in this case.  So forget
that part.  Forget that number.

*Light-skinned Hispanic.  A man.  Half the
people in the general population are not
men.  So, from that eight or so people, cut
it down to four.  How many of the people in
the general population with that profile are
likely to be sixteen to twenty-one years
old, young looking?  You've got to lose at
least one or two guys right there.  How many
people are left that fit the description of
the shooter and can possibly have the
defendant's DNA profile?  Aren't we getting
down to one, light-skinned; height, five-
three, five-six, shorter than average?*

*How many people are left?  I suggest to you,
ladies and gentlemen, the only one left is
this man right here, that it's his blood on
the jacket.  Based on the DNA evidence and
the description of the shooter, there is
only one person left, the defendant.*

(T.V/68-69) (emphasis added).

At the conclusion of the prosecutor's summation,

defense counsel forcefully objected to this portion of

the closing argument because no demographic evidence

was introduced to establish the population of Boston

(T.V/77-78), much less the number of men versus women

in the general population, the number of Hispanic men

between the ages of sixteen and twenty-one, etc.

The court agreed with the defense objection

(T.V/78), and instructed the jury to disregard the

prosecutor's comment:

10

> . . .I just want to tell you that that
> portion of the Commonwealth's closing
> statement that referred to the population
> size of the City of Boston and what can be
> extrapolated from that is stricken from the
> record.  You are to disregard that in
> deciding the issues in this case, because
> there is no evidence about what the
> population of the City of Boston is
> presented in this case.

(T.V/79).

Despite the trial court's curative instruction,
a reversal is required.  The remarks were flagrant,
not based on any evidence, and were especially
prejudicial, zeroing in on the defendant as the "only
one left" who could have committed the crime.  The
prosecutor's closing argument created "substantial
error" which could not be fixed by a curative
instruction.  See, e.g., Commonwealth v. Adamides, 37
Mass.App.Ct. 339, 343 (1994) (prosecutor's closing may
create substantial error that cannot be fixed by
curative instruction).

Equally pernicious, the prosecutor improperly
argued on two (2) separate occasions that the gun used
in the murder was a 9mm handgun -- even though there
was no evidentiary basis to do so.  First, the
prosecutor argued:

> At some point that morning she [Carmen
> Torres] sees a gun on him.  She sees a gun

11

> on him at the bus stop.  She saw a gun on
> the defendant, "Pitbull", on Sunday as well.
> She talked to him about the gun on Sunday.
> He had the gun at her house. She described
> it as a 9mm gun because that's what he told
> her it was.  It's color he describes to you.
> *What kind of gun is used in the murder? A
> 9mm*.

(T.V/57-58)(emphasis added).

Subsequently, the prosecutor again argued, "The
defendant had the means to do the crime.  He had a
gun, *the same type of gun that was used in the crime,
the 9mm*" (T.V/70) (emphasis added).

As previously established in Argument I, *supra,
the Commonwealth failed to present any evidence from
its twenty-seven (27) witnesses that the five (5)
spent bullet casings recovered from the crime scene
were shot from a 9mm weapon*.  In particular, the
Commonwealth never presented police or expert
ballistician testimony at the trial that the five (5)
spent casings recovered at the crime scene were 9mm
shells.  *Detective Mark Vickers, the Commonwealth's
ballistician, was never asked and never testified to
the caliber of the weapon which fired the five (5)
spent shells* (T.IV/17-19).  Thus, there was no factual
basis whatsoever for the prosecutor to twice argue
that the gun used in the murder was a 9 mm handgun.

12

"Arguments that are unsupported by the evidence and thus are speculative and conjectural are, of course, improper." Commonwealth v. Kozec, 399 Mass. at 524 (reversing conviction because of prosecutor's factually baseless summation); United States v. Smith, supra, at 682.

The baseless argumentation in the present case was especially prejudicial and mandates reversal. Lacking any identification of the Petitioner at the scene, the prosecutor improperly attempted to connect Petitioner to the crime by first arguing, based upon Carmen Torres's testimony, that Petitioner owned a 9mm handgun, and then claiming without any evidentiary support that the murder weapon was also a 9mm handgun.

In rejecting the Petitioner's argument that the prosecutor's summation was improper and violated due process, the Massachusetts Supreme Judicial Court ("SJC") did find that the prosecutor twice deliberately referred to matters not in evidence, including the prosecutor's demographic references and his assertion that a nine millimeter handgun was the murder weapon. Nevertheless, the SJC went on to affirm Petitioner's conviction, holding that the misstatements did not require reversal. Rather than

13

consider the errors collectively looking at their impact as a whole, as the SJC was required to do under its own case precedent (*see, e.g.*, Commonwealth v. Loguidice, 420 Mass. 453, 454), the Court looked at each error individually utilizing differing standards of review, and concluded that reversal was *not* required.

First, with respect to the demographic references, the SJC applied the four-part test set forth in Commonwealth v. Kozec, 399 Mass. 514, 518 (1987), including: (1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave to the jury which may have mitigated the mistake; and, (4) whether the error, in the circumstances, possibly made a difference in the jury's conclusions. Applying this test, the SJC acknowledged that Arroyo had objected to the improper statements and that the remarks went to the heart of the Commonwealth's case; nevertheless, the court held that the Court's curative instruction "augers for the Commonwealth" (p. 148) and finally held,

14

> . . .the fourth factor [i.e., whether the
> error "possibly" made a difference]] is
> determinative. Although the expert's
> testimony did not establish to a certainty
> that Arroyo was the source of the bloodstain
> on the green jacket, it did support a strong
> inference that he was. Considered in
> conjunction with the rest of the evidence, we
> cannot say that the Commonwealth's error,
> particularly after the judge's curative
> instruction, made a difference in the jury's
> conclusions. . . .

(Decision, p. 148).

The SJC's decision upholding the conviction is

erroneous, especially because it relies upon the very

piece of evidence whose significance the prosecutor

intentionally overstated in his summation. The

prosecutor argued that the Petitioner "must be the

one" because no other Hispanic in the Boston area had

the same DNA profile as that found on the green

jacket. This deliberate misstatement of evidence --

unfairly attributing qualities to the DNA evidence

which could not be found in the record -- might very

well have made a difference in the jury's conclusions

because the evidence was otherwise far from

overwhelming, if not weak and legally insufficient

(Argument I, supra).

Nor could the trial court's curative

instruction "unring" the bell which had been "rung" in

15

the courtroom. The prosecutor's point had been made in front of the jury, albeit an entirely baseless and improper one. The SJC entirely overlooked the Petitioner's claim that the prosecutor's closing argument created "substantial error" which could not be fixed by a curative instruction. See Commonwealth v. Adamides, 37 Mass.App.Ct. 339, 343 (1994) (prosecutor's closing may create substantial error that cannot be fixed by curative instruction).

Nor did the SJC consider and discuss the impact of the above-enumerated error in conjunction with the prosecutor's concededly baseless remark that a nine millimeter gun was used in the crime. The SJC acknowledged that "the Commonwealth's error was to suggest that there was direct evidence that the victims were shot with a nine millimeter weapon, thus making it more likely that Arroyo, who had a nine millimeter handgun was the shooter." (p. 148). The state court then went on to find, however, that there was "no need for such evidence"; that the jury could otherwise have inferred Petitioner's use of a nine millimeter weapon from the record evidence; and, that the rest of the evidence supporting Petitioner's guilt, including his statements and the evidence

16

linking him to the green jacket, was otherwise
sufficient to conclude that, "absent the error, the
jury verdicts would have been the same" (p. 148).

Again, the SJC's conclusion is unsupported and
erroneous. Petitioner's whole point on appeal was
that the admitted *lack* of any evidence that a nine
millimeter handgun was used as the murder weapon
otherwise *negated* and rendered meaningless other
evidence that the Petitioner allegedly possessed a
nine millimeter handgun (according to Carmen Torrez),
and thus, Petitioner could have been the shooter.  The
prosecutor's second, intentional misstatement -- for
which no curative instruction was given -- also went
to the heart of the Commonwealth's case and was used
to shore up a very weak and entirely circumstantial
case.

The cumulative impact of these misstatements by
the prosecutor undoubtedly influenced the jury's
decision to convict.  Where, like here, a federal due
process claim of error is raised, there must be a new
trial "unless it is clear beyond a reasonable doubt
that the jury would have returned a verdict of guilty
in the absence of error."  Commonwealth v. Loguidice,
420 Mass. at 456, n. 4, citing United States v.

17

Hasting, 461 U.S. 499, 510-511 (1983). Based upon the
prosecutor's deliberate misstatements of evidence, the
jury undoubtedly (and unfairly) concluded that
Petitioner was the shooter because the demographic
evidence based upon the DNA evidence pointed to that
inescapable conclusion (according to the
Commonwealth), and, because a nine millimeter handgun
was used as the murder weapon (as baselessly argued by
the prosecutor) and Petitioner possessed such a
weapon.

The prosecutor's improper and baseless
argument, "'so infected the trial with unfairness as
to make the resulting conviction a denial of due
process.'" Darden v. Wainright, 477 U.S. at 181,
quoting Donnelly v. DeChristoforo, 416 U.S. at 643.

## III. PROBABLE CAUSE WAS LACKING FOR THE STATE COURT TO ORDER THE TAKING OF BLOOD FROM THE PETITIONER. THUS, THE BLOOD EVIDENCE AND ITS FRUITS SHOULD HAVE BEEN SUPPRESSED, AND THE PETITIONER'S CONVICTION MUST BE REVERSED.

An order compelling one to give a blood sample
is a search and seizure under the Fourth Amendment,
and thus, it must be supported by probable cause.
Schmerber v. California, 384 U.S. 757, 767 (1966).

In this case, the Commonwealth relied solely
upon the grand jury minutes in attempting to establish

18

probable cause for an order to take the Petitioner's blood (Appendix to State Court Brief, pp. 141-142). Nothing in the prosecutor's supporting affidavit, nor in her oral presentation before the Court in support of the application, set forth any additional facts to establish probable cause that the Petitioner was in any way connected to the crime.

At the grand jury proceedings, no eyewitness testimony was presented identifying the Petitioner as having been present at the scene and/or involved in the shooting (Grand Jury Minutes, Appendix to Appellant's State Court Brief, pp. 23-129). At most, the Commonwealth presented inadmissible, double-hearsay testimony from an Inez Ruiz that Ivaliz Leon was the Petitioner's girlfriend, and that Leon allegedly stated that police were looking for her because, "her boyfriend killed somebody" (Appendix, Grand Jury Minutes, R.108-109), although not referring to the Petitioner by name nor as her "boyfriend" in this statement, nor even identifying by name the person whom her "boyfriend" allegedly killed (R.108-109). There was also double hearsay testimony from a Jesenia Garcia concerning statements that Ivaliz Leon allegedly made to her about the crime. However, when

19

pointedly asked about the Petitioner's involvement,

Garcia testified as follows:

Q.  Did she tell you who committed the murder?
A.  No.
Q.  Did she tell you that Pitbull did it?
A.  No.

(Grand Jury Minutes, R.67).

Probable cause was lacking to order seizure of

the Petitioner's blood sample.  Because the DNA

evidence was a centerpiece of the Commonwealth's case,

the error in permitting the taking of Arroyo's blood

and then admitting the blood evidence at the trial was

prejudicial error requiring reversal and a dismissal

of the charges.

## IV.  THE TRIAL COURT ERRONEOUSLY ADMITTED EXPERT WITNESS TESTIMONY CONCERNING PREJUDICIAL DNA BLOOD EVIDENCE WITHOUT FIRST CONDUCTING A HEARING REGARDING ITS RELIABILITY.

To ensure the reliability of DNA test results as

a matter of due process, the trial judge, *sua sponte*,

must conduct a hearing in the first instance and make

a threshold inquiry concerning the reliability of the

testing procedures before submitting such evidence to

the jury.  United States v. Martinez, 3 F.3d 1191,

1198 (8th Cir. 1993) (trial judge is "gatekeeper" of

admissibility of such evidence under Daubert v.

Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579

20

## CONCLUSION

For the above-stated reasons, this Honorable

Court should grant Petitioner's accompanying

application for writ of habeas corpus, reverse the

state court conviction, and remand the case for a new

trial.

By his attorney,

Donald A. Harwood, Esq.
305 Broadway
New York, NY   10007
(212) 822-1400
BBO# 225110

Dated:   June 13, 2005

COMMONWEALTH OF MASSACHUSETTS

SUPREME JUDICIAL COURT FOR THE COMMONWEALTH

AT BOSTON,    June 25, 2004

IN THE CASE NO. SJC-08991

COMMONWEALTH

---

vs.

EZEQUIEL ARROYO

---

pending in the _____ Superior Court Department of the Trial

Court for the County of_____ Suffolk _____ No. 98-11021 _____

ORDERED, that the following entry be made in the docket;
viz., --

The judgments are affirmed.

BY THE COURT,

Susan Meller, CLERK.

June 25, 2004

COMMONWEALTH OF MASSACHUSETTS

SUPREME JUDICIAL COURT FOR THE COMMONWEALTH

AT BOSTON,    June 25, 2004

IN THE CASE NO. SJC-08991

COMMONWEALTH

vs.

EZEQUIEL ARROYO

pending in the _____ Superior Court Department of the Trial

Court for the County of_____ Suffolk _____No. __98-11021_____

    ORDERED, that the following entry be made in the docket;
viz., --

    The judgments are affirmed.

BY THE COURT,

_Susan Reller_, CLERK.

_June 25, 2004_

SJC-08991

COMMONWEALTH vs. EZEQUIEL ARROYO.

Suffolk.     April 6, 2004. - June 25, 2004.

Present: Marshall, C.J., Greaney, Spina, Sosman, & Cordy, JJ.

Practice, Criminal, Required finding, Argument by prosecutor,
   Instructions to jury, Capital case. Evidence, Motive,
   Exculpatory, Blood sample, Relevancy and materiality, Expert
   opinion. Deoxyribonucleic Acid. Homicide. Probable Cause.
   Search and Seizure, Probable cause. Constitutional Law,
   Probable cause. Intent.

    Indictments found and returned in the Superior Court
Department on August 3, 1998.

    A motion to dismiss was heard by Charles T. Spurlock, J.,
and the cases were tried before him.

    Donald A. Harwood for the defendant.
    Seema Malik Brodie, Assistant District Attorney (Dennis H.
Collins, Assistant District Attorney, with her) for the
Commonwealth.

    CORDY, J. Luis Rivera and Marie LaBranche were shot on the

afternoon of May 19, 1998, as they stood in a crowd on a sidewalk

in the Dorchester section of Boston. Rivera died from his

wounds. Following a jury trial, Ezequiel Arroyo was convicted of

murder in the first degree, assault and battery by means of a

dangerous weapon, and unlawful possession of a firearm. On

appeal, he argues that the evidence was insufficient to support

the convictions; the indictments should have been dismissed both

because evidence presented to the grand jury did not amount to

probable cause and because the Commonwealth failed to present

2

exculpatory evidence of which it was aware; there was an insufficient basis on which to order that a postindictment blood sample be taken from the defendant; the trial judge improperly admitted certain evidence; parts of the Commonwealth's closing argument were improper and prejudicial; and a portion of the judge's charge to the jury was erroneous. Arroyo also argues that his conviction of murder in the first degree should be vacated pursuant to our authority under G. L. c. 278, § 33E. We affirm.

1. Background. The evidence introduced at trial was largely circumstantial, and included the following. Shortly after 3 P.M. on May 19, 1998, five shots were fired in front of the Pilgrim Church on Columbia Road in Dorchester, where a crowd was gathered for a clothing sale. Four of the shots struck Luis Rivera in the chest and in the head, killing him. One of the shots struck Marie LaBranche in the leg, injuring her.

Eyewitnesses to the shooting testified that the assailant was a male (of unidentified ethnicity, but who "had white skin"), sixteen to twenty-one years old, between five feet, three inches and five feet, eight inches tall, "buffed" (as opposed to having a "husky build"), with dark hair and without a hat, wearing brown corduroy trousers, and a green nylon or flight-type jacket.[1]  No eyewitness saw the assailant's face, and no one could identify

---

[1] On cross-examination by defense counsel, a police officer testified that another unidentified person reported to him at the scene that the assailant was Hispanic and was wearing a green or blue jacket, a dark-colored hat, and jeans.

3

Arroyo as the perpetrator. At the time of his arrest, Arroyo, a light-skinned Hispanic male with dark hair, was eighteen years old, five feet, three inches tall, and weighed 140 pounds.

After the shooting, the assailant ran down Columbia Road and turned the corner onto Arion Street. A resident living at 6 Arion Street testified that he saw a white or Hispanic male wearing a green jacket run up Arion Street, leap a chain link fence to cross into a back yard, and disappear as he ran through that yard toward Virginia Street.

In response to reports of the assailant's flight, police officers searched the area around Arion and Virginia Streets. Hearing a report that individuals at 9 Virginia Street saw someone run through their yard from Virginia Street toward Monadnock Street, one police officer crossed through that yard and expanded the search toward Monadnock Street. The assailant was not apprehended, but the police found a nylon green jacket, which appeared to have been discarded recently, lying along a fence at the back of 10 Virginia Street.

A witness to the shooting testified that this green jacket, depicted in a photograph admitted at trial, was "pretty similar" to the jacket that she saw the assailant wearing at the shooting. After Arroyo's arrest, a criminalist at the Boston police crime laboratory performed polymerase chain reaction (PCR) type deoxyribonucleic acid (DNA) testing on a blood stain found on the

4

exterior right chest of the jacket.[2]  The DNA profile revealed that Arroyo was a possible source of that blood stain, and that only one in 75,000 Caucasians, one in 81,000 Southeastern Hispanics, and one in 1,300,000 African-Americans shared that profile.

The Commonwealth also introduced evidence that on the day before the shooting, Eveliz Leon, Arroyo's girl friend, had become very agitated, had accused Rivera, the deceased victim, of stealing items that belonged to her and to Arroyo, and had asked Arroyo "to do something about it."  More specifically, there was testimony that:  on May 17, Leon and Arroyo moved in to stay for a period with Leon's cousin, Carmen Torres, who had previously been in a long-term relationship with Rivera resulting in the birth of her three children; when Leon moved in, she brought three bags of clothing with her, some of which belonged to Arroyo; those clothes were stolen from Torres's apartment on May 18; and Leon and Arroyo believed that Rivera had stolen them.[3]

---

[2] There also were blood stains on the wrist of the jacket. The Commonwealth suggested a source for the blood stains, presenting evidence at trial to demonstrate that an individual firing a semiautomatic nine millimeter handgun could, with an improper grip on the pistol, receive a cut by the action of the pistol's slide.  However, although the Commonwealth introduced evidence to show that Arroyo was in possession of a nine millimeter handgun on the day of the shooting, it did not present evidence that he ever received an injury from it or that it was used in the crime.

[3] There was also testimony at trial from Rivera's sister that, on May 18, Rivera had come home with trash bags full of clothing that was not his, that he washed the clothing, and that on the day he was shot he had been wearing some of it.

5

The next morning at approximately 10 A.M., Torres walked with Leon and Arroyo to a bus stop, where Arroyo and Leon took a bus to a travel agency to purchase airline tickets for them both to travel to Puerto Rico.[4] On the way to the bus stop, the three continued a discussion begun the night before about Rivera's alleged theft of the clothes. To avoid further argument, Torres told Arroyo to "forget about it," and that she would pay for the clothes. Arroyo replied, to the contrary, that he would "take care of [it]." Before Arroyo got on the bus, Torres saw that he was carrying a nine millimeter handgun and wearing a jacket, the color of which she could not remember at trial.[5]

Torres next saw Arroyo at some time after 5 P.M. that same

---

[4] Leon's children were then living in Puerto Rico, and she had been planning to go there. The defendant decided to accompany her at some point on or shortly before May 18. The Commonwealth introduced evidence to show that on May 19 a travel agency sold two tickets to travel on May 24 from Newark, New Jersey to San Juan, Puerto Rico. One ticket was for Leon; the other, however, was for an Alberto Diaz. No evidence was presented regarding the identity of Alberto Diaz, or whether that was an assumed name for the defendant. The name "Alberto Diaz" was redacted and kept from the jury. Torres testified at trial that she saw both tickets, and that one was issued to Leon and the other to Arroyo. The tickets were never used.

[5] Nine millimeter shell casings had been found at the scene of the shooting, but were excluded from evidence by the trial judge who ruled, pretrial, that they were not adequately linked to the defendant. We presume that the judge's ruling was based on the consideration that Arroyo's gun was never recovered, tested, and matched to the shells. While the lack of such a match may reduce the weight of this evidence, it is not a basis on which to exclude evidence of the shell casings themselves. They tend to prove that the victims were shot with a nine millimeter gun, and are therefore relevant to the circumstances of the shooting. Their relevance is heightened where, as here, there was testimony that Arroyo possessed such a weapon shortly before the shooting. This evidence was erroneously excluded.

6

day, at a birthday party. He was no longer wearing a jacket. At that time, Torres had not learned of Rivera's death. When Arroyo saw Torres, he said, "I'm sorry," without explanation. He then spoke to Leon, who had returned from the travel agency earlier in the day without Arroyo. Leon asked Torres to move away so that she and Arroyo could talk privately. Within five minutes of arriving, Arroyo left. Later that evening, Leon also left Torres, and Torres did not see either of them again until the time of trial.

2. Discussion. a. Sufficiency of the evidence. Defense counsel moved for required findings of not guilty at the close of the Commonwealth's case, and renewed the motion at the close of the defendant's case and again after the verdicts. Those motions were denied, and Arroyo challenges those decisions on appeal. In assessing his claim, we must determine whether the evidence presented at trial, together with all reasonable and possible inferences that might properly be drawn from it, was sufficient to permit a rational jury to find beyond a reasonable doubt the existence of every essential element of the crimes charged. Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). We conclude that it was.

While the Commonwealth did not present any direct evidence that Arroyo was the assailant, direct evidence is not necessary to convict. "[C]ircumstantial evidence is competent to establish guilt beyond a reasonable doubt," and inferences drawn from it need only be reasonable and possible, not necessary or

7

inescapable.  Commonwealth v. Bush, 427 Mass. 26, 30 (1998).

Viewing the evidence in its light most favorable to the
Commonwealth, Commonwealth v. Morris, 422 Mass. 254, 255 (1996),
the jury could have found that Arroyo had a motive to murder
Rivera (the theft of his and Leon's clothing), an intention to
confront Rivera on the day of the shooting, the means to murder
Rivera and to injure LaBranche (a nine millimeter handgun), and a
plan to flee to Puerto Rico to evade detection and arrest.  In
addition, they could have found that Arroyo generally fit the
description of the assailant given by the eyewitnesses who
testified, and that the green jacket worn by the assailant and
discarded by him shortly after the shooting along his path of
flight had been worn and discarded by Arroyo that day.  Finally,
they could have concluded that Arroyo's unexplained apology to
Torres that evening, before the victim's death was known to her,
was an apology for killing the father of her children just hours
before.[6]

Arroyo contends, however, that evidence regarding the green
jacket was too inconclusive for the jury both to have inferred
that the jacket found by the police had been worn by the
assailant, and that Arroyo was wearing it at the time of the
shooting.  We disagree with Arroyo's analysis.

The jury could properly have inferred from the evidence that
the jacket was worn by the assailant.  It was found along the

_____

[6] Torres did not learn that Rivera had been shot until the
next day.

8

assailant's path of flight; a police officer testified that it appeared to have been discarded recently; and an eyewitness to the shooting testified that it was similar to the one she saw the assailant wearing. The jury could also have inferred from the DNA evidence that the jacket had been worn by Arroyo.

While we agree that these two inferences, standing alone, might not have been sufficient to establish that Arroyo was the assailant, see Commonwealth v. Swafford, 441 Mass. 329, 340-342 (2004) (presence of defendant's automobile at scene of shooting insufficient to prove presence or guilt); Commonwealth v. Morris, supra at 257-258 (presence of plastic mask with defendant's thumbprint left by gunman at shooting scene insufficient to establish presence or guilt),[7] they nonetheless constituted reasonable and possible inferences relevant to and consistent with Arroyo's guilt. As such, they could properly have been considered along with other evidence supporting the same conclusion. The relevant question is whether all of the evidence, including the permissible inferences drawn therefrom, taken together, supports a finding, beyond a reasonable doubt,

---

[7] In both of these cases, there was evidence that, in the hours preceding the shootings, the defendants associated with other individuals who subsequently were convicted of the crimes, see Commonwealth v. Swafford, 441 Mass. 329, 339-340 (2004); Commonwealth v. Morris, 422 Mass. 254, 258-259 (1996), and that it was equally possible that the individuals who were convicted, had, just before committing the crimes, borrowed, respectively, the automobile and the mask. There is no evidence in this case to suggest a scenario in which the green jacket might have passed from Arroyo to another person between the time that the blood stain appeared on it and the time of the shooting.

9

that Arroyo was the assailant. Here, that evidence included a
great deal more than permissible inferences regarding the green
jacket. The motions for required findings of not guilty were
properly denied.[8]

b. Dismissal_of_the_indictments. Before trial, Arroyo
moved to dismiss the indictments, arguing that the Commonwealth
failed to present to the grand jury sufficient evidence of his
guilt, and failed to present evidence that would have exculpated
him. The judge properly denied the motion, and cases cited.

With regard to the sufficiency of the evidence, we consider
only whether "the grand jury [heard] sufficient evidence to

---

[8] Arroyo also argues generally that Commonwealth v. Mandile,
403 Mass. 93 (1988), and Commonwealth v. Mazza, 399 Mass. 395
(1987), cases in which we reversed convictions of murder in the
first degree, require reversal here. We disagree. Our decision
in Commonwealth v. Mandile, supra at 96, 99-102, is inapposite.
There, the conviction was reversed because there was no evidence
that money found on the defendant was taken from the victim, and
thus insufficient evidence that a robbery, on which the felony-
murder theory rested, had occurred. There also was no evidence
that the defendant shared his alleged coventurer's intent to
commit the murder, which occurred after the coventurer had been
alone with the victim (away from the defendant) for nearly
fifteen minutes, and where no other actions by the defendant
(such as suddenly driving away) indicated any knowledge that the
murder had occurred. None of those circumstances is present in
this case. In Commonwealth v. Mazza, supra at 396-400, we
reversed because, although the Commonwealth could establish the
defendant's motive and consciousness of guilt, and could show
that the defendant arranged to meet the victim at the scene of
the murder and went with a friend to the scene at around the time
of the murder, the Commonwealth could not explain why no one
heard gun shots during the short period of time that the
defendant was at the scene, why there was no evidence that the
defendant carried a gun that day, and why there was no
fingerprint or other evidence connecting the defendant to the
homicide. Here, in contrast, there is evidence that Arroyo had a
motive and a gun and that the green jacket worn by the assailant
during the crime had been worn by Arroyo.

10

establish the identity of the accused . . . and probable cause to arrest [him]" for the crimes charged. Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982), and cases cited.

Arroyo asserts that the Commonwealth presented no eyewitness testimony to the grand jury placing him at the scene, but instead relied on "inadmissible, double-hearsay testimony" that Arroyo's girl friend (Leon) stated that her boy friend "killed somebody."[9] First, Arroyo is mistaken to suggest that an indictment may not be based on hearsay testimony. See Commonwealth v. Kater, 432 Mass. 404, 412 (2000); Commonwealth v. McCarthy, supra at 162. Second, he minimizes the evidence actually presented to the grand jury. The grand jury heard testimony establishing Arroyo's motive (the stolen clothing), his plan of escape (the tickets to Puerto Rico), his possession on the morning of May 19 of a nine millimeter handgun consistent with the nine millimeter shell casings found at the scene, see note 5, supra, and his nervous manner in the hours immediately following the shooting. They also heard testimony regarding statements made by Leon that her boy friend had "killed somebody." This evidence was sufficient for the grand jury to have found probable cause to believe that Arroyo fired the shots that injured LaBranche and killed Rivera.

With regard to the Commonwealth's alleged failure to present exculpatory evidence, we do not require prosecutors "in all instances to bring exculpatory evidence to the attention of grand

---

[9] This testimony was not offered at trial.

juries." Commonwealth v. O'Dell, 392 Mass. 445, 447 (1984).
Instead, we require that prosecutors not "distort the meaning" of
the evidence that they present by withholding certain portions of
it. Id. at 449. "It is only when the prosecutor possesses
exculpatory evidence that would greatly undermine either the
credibility of an important witness or evidence likely to affect
the grand jury's decision, or withholds exculpatory evidence
causing the presentation to be 'so seriously tainted,' that the
prosecutor must present such evidence to the grand jury."
Commonwealth v. Wilcox, 437 Mass. 33, 37 (2002), quoting
Commonwealth v. O'Dell, supra at 447. This is not such a case.

Arroyo claims specifically that the Commonwealth did not
call the eyewitnesses to the shooting to testify, and,
consequently, that the jury were not apprised of their inability
to identify Arroyo. That eyewitnesses to the shooting could not
identify Arroyo as the assailant, however, was clear from the
testimony of the investigating officers who did testify before
the grand jury. It was not a fact withheld from the jurors by
the Commonwealth. Moreover, these allegedly exculpatory
eyewitnesses appeared and testified in the Commonwealth's case at
trial, and the jury found Arroyo guilty beyond a reasonable
doubt. This is hardly the kind of evidence that would likely
have affected the grand jury's decision.

c. Probable cause for taking the blood sample. After
indictment and before trial, the Commonwealth moved for an order
to take a sample of Arroyo's blood for comparison with the blood

stains on the green jacket. After a hearing, a Superior Court judge allowed the Commonwealth's motion. Arroyo challenges this ruling on appeal.

"An order compelling one to give a blood sample is a search and seizure under the Fourth Amendment [to the United States Constitution]." Commonwealth v. Trigones, 397 Mass. 633, 640 (1986). After indictment, the Commonwealth need only show "that a sample of the defendant's blood will probably produce evidence relevant to the question of the defendant's guilt" in order to satisfy its constitutional burden. Id. That burden was satisfied in this case. At a hearing on the Commonwealth's motion, the Commonwealth adequately demonstrated that matching a blood sample from Arroyo with the blood taken from the green jacket worn by the assailant would probably produce evidence relevant to his guilt. Nothing more was required.

d. Admission of the green jacket. Arroyo argues that the judge erred in admitting evidence of the green jacket because it was found a distance from the shooting, was not adequately identified as having been worn by Arroyo or by the assailant, and because, in conjunction with the DNA evidence linking it to him, it was unduly prejudicial.

The relevance threshold for the admission of evidence is low. "Evidence is relevant if it has a 'rational tendency to prove an issue in the case,' Commonwealth v. LaCorte, 373 Mass. 700, 702 (1977), or render a 'desired inference more probable than it would be [otherwise].' Commonwealth v. Fayerweather, 406

13

Mass. 78, 83 (1989). It 'need not establish directly the proposition sought; it must only provide a link in the chain of proof.' Commonwealth v. Yesilciman, 406 Mass. 736, 744 (1990), quoting Commonwealth v. Tobin, 392 Mass. 604, 613 (1984)." Commonwealth v. Sicari, 434 Mass. 732, 750-751 (2001), cert. denied, 534 U.S. 1142 (2002). Relevant evidence is admissible unless unduly prejudicial, and, "[i]n weighing the probative value of evidence against any prejudicial effect it might have on a jury, we afford trial judges great latitude and discretion, and we uphold a judge's decision in this area unless it is palpably wrong." Id. at 752.

Here, evidence regarding the green jacket was relevant, and there was no error in the judge's determination to admit it. The jacket, which matched eyewitnesses' descriptions of the jacket worn by the assailant, was found along the assailant's path of flight, and was connected by DNA evidence to Arroyo. This evidence made more probable the Commonwealth's contention that Arroyo was the assailant who murdered Rivera and injured LaBranche. Arroyo has not identified anything "unduly prejudicial" about this evidence, only its tendency to inculpate him. See id. at 749-752 (finding admission of evidence that semen containing defendant's DNA was found at scene of murder of ten year old boy not unduly prejudicial). The admission in evidence of the green jacket was not error.

e. Admission of DNA evidence. Arroyo argues that admission of expert testimony regarding DNA tests that linked the green

14

jacket to him was improper because the judge did not first conduct a hearing regarding the reliability of such tests. Defense counsel did not object to the testimony at trial.

We have recognized the value and reliability of PCR-based DNA testing, see, e.g., Commonwealth v. Vao Sok, 425 Mass. 787, 789-792, 799 (1997), and we apply an abuse of discretion standard when reviewing trial judges' decisions to admit scientific testimony, see Canavan's Case, 432 Mass. 304, 312 (2000). "To preserve objections to DNA analysis of the type in issue, a defendant must file an appropriate pretrial motion stating the grounds for the objections and [must] request a hearing in accordance with the principles set forth in Canavan's Case, [supra at 309-312] . . . ." Commonwealth v. Sparks, 433 Mass. 654, 659 (2001). Arroyo failed to do so here, and "it is now too late to raise objections concerning the reliability of the testing and the conclusions reached." Id. at 660.

To the extent that Arroyo alleges that his attorney's failure to object at trial to admission of the testimony constituted ineffective assistance of counsel, he has failed to allege any facts that would suggest that such an objection would have succeeded and that he was thereby prejudiced by its absence. See Commonwealth v. Saferian, 366 Mass. 89, 96 (1974) ("whether there has been serious incompetency . . . of counsel . . . [and] whether it has likely deprived the defendant of an otherwise available, substantial ground of defence"). Cf. Commonwealth v. Sparks, supra at 659-660 ("trial counsel made no [objection on

15

the basis of reliability] in this case, apparently for tactical reasons. . . . Trial counsel also may have considered [the expert's] reputation for quality forensic work"). Independently reviewing the expert's testimony at trial, we find no basis to conclude that it was without adequate scientific basis. The judge's admission of the evidence was not error, and Arroyo's trial counsel did not render ineffective assistance by failing to object to it.

f. Commonwealth's closing argument. In closing argument, the prosecutor correctly noted expert testimony that the defendant was one in 81,000 Southeastern Hispanics whose DNA profile matched that found in the blood stain on the green jacket. He also, however, estimated the male, nonblack population of Boston, and from that concluded that "the only one" who could have worn the green jacket was Arroyo.[10] The

[10] After noting the DNA profile ratios, the prosecutor said:

"Now, let's assume -- look at the number of people who live in Boston. Six hundred thousand people or so, give or take. Let's assume there are eight white people with that DNA profile, given those numbers. We assume half the people in Boston are white. Eight.

"What else can we assume about that general population of people in Boston who are white and have that DNA profile? How many guys fit that profile? Well, forget about the black guys, ladies and gentlemen, because the shooter wasn't black. That's not -- that's the shooter's jacket. The shooter's description isn't black . . . .

"Light-skinned Hispanic. A man. Half the people in the general population are not men. So, from that eight or so people, cut it down to four. How many of the people in the general population with that profile are likely to be sixteen to twenty-one years old, young looking? You've got

16

demographic statistics to which the prosecutor referred were not in evidence. Similarly, the prosecutor twice stated in closing argument that a nine millimeter gun was used in the shooting.[11] There was, however, no evidence at trial that the victims were shot with a nine millimeter, as that evidence had been erroneously excluded. See note 5, supra. Defense counsel objected to the Commonwealth's demographic argument, and the judge gave a curative instruction, directing the jury to disregard it because no evidence regarding the city of Boston's population was presented in the case. Defense counsel did not object to the Commonwealth's statements regarding the nine millimeter gun. Arroyo argues that both arguments were improper and require reversal.

It is beyond debate that counsel must restrict closing argument to the evidence and the fair inferences that might be drawn therefrom. E.g., Commonwealth v. Kelly, 417 Mass. 266, 270 (1994). It also is well established that, in this regard, the Commonwealth "and its prosecutors are held to a stricter standard

---

to lose at least one or two guys right there. How many people are left that fit the description of the shooter and can possibly have the defendant's DNA profile? Aren't we getting down to one, light-skinned; height, five-three, five-six, shorter than average?

"How many people are left? I suggest to you, ladies and gentlemen, the only one left is this man right here, that it's his blood on the jacket."

[11] In one instance, the prosecutor stated: "What kind of gun is used in the murder? A nine millimeter." In the other, the prosecutor stated: "The defendant . . . had a gun, the same type of gun that was used in the crime, the nine millimeter."

of conduct than are errant defense counsel and their clients."
Commonwealth v. Kozec, 399 Mass. 514, 519 (1987). The prosecutor
surely was aware that there was no evidence introduced at trial
regarding either the ethnicity of Boston's population or the
caliber of the weapon used to shoot the victims.[12]  The
Commonwealth's excursion outside the evidentiary realm, and
invitation that the jury do the same, was wholly improper.

It is not enough, however, for a defendant to show that the
Commonwealth made improper reference to alleged facts not in
evidence during closing argument. "When a defendant raises a
claim of error regarding a prosecutor's closing argument, we
consider (1) whether the defendant seasonably objected; (2)
whether the error was limited to collateral issues or went to the
heart of the case; (3) what specific or general instructions the
judge gave the jury which may have mitigated the mistake; and (4)
whether the error, in the circumstances, possibly made a
difference in the jury's conclusions." Commonwealth v. Kater,
432 Mass. 404, 422-423 (2000).  See Commonwealth v. Kelly, supra

---

[12] The Commonwealth argues that evidence that Arroyo
possessed a nine millimeter handgun and evidence regarding a hand
injury that might result from the improper use of a nine
millimeter handgun constituted admission of evidence that a nine
millimeter handgun was used at the shooting.  See note 2, supra.
This is without merit.  It appears from the trial transcript that
the Commonwealth introduced evidence that the defendant possessed
a nine millimeter handgun to demonstrate that he had the means to
commit a shooting; evidence regarding the improper use of such a
handgun was admitted to support the Commonwealth's theory
regarding the source of the blood stain on the green jacket.
There was no evidence regarding the caliber of the gun used in
the shooting.

18

at 271. Here, the defendant failed to object to an improper argument, and "our review is limited to whether there was a substantial likelihood of a miscarriage of justice." Commonwealth v. Kater, supra at 423, citing Commonwealth v. Johnson, 429 Mass. 745, 748 (1999). A substantial likelihood of a miscarriage of justice exists "unless we are substantially confident that, if the error had not been made, the jury verdict would have been the same."[13] Commonwealth v. Nunes, 430 Mass. 1, 5 (1999), quoting Commonwealth v. Ruddock, 428 Mass. 288, 292 n.3 (1998).

Applying the first three factors of the four-factor analysis to the demographic references, we note that (1) Arroyo did object, (2) the connection between the green jacket and Arroyo arguably was close to the heart of the Commonwealth's case, and (3) the judge explicitly instructed the jury to disregard the demographic data for the express reason that it was not supported by evidence. The objection and the importance of the issue help Arroyo to satisfy his burden; the judge's instruction augers for the Commonwealth. In this case, however, the fourth factor is determinative. Although the expert's testimony did not establish to a certainty that Arroyo was the source of the bloodstain on the green jacket, it did support a strong inference that he was. Considered in conjunction with the rest of the evidence, we

---

[13] This is the same standard that we would apply in considering whether defense counsel's failure to object constituted ineffective assistance of counsel. See, e.g., Commonwealth v. Dinkins, 440 Mass. 715, 721 (2004).

cannot say that the Commonwealth's error, particularly after the judge's curative instruction, made a difference in the jury's conclusions.

With regard to the Commonwealth's assertions that a nine millimeter handgun was the murder weapon, to which there was no objection, the Commonwealth's error was to suggest that there was direct evidence that the victims were shot with a nine millimeter weapon, thus making it more likely that Arroyo, who had a nine millimeter handgun, was the shooter. There was, of course, no need for such direct evidence, and even without it the prosecutor could have argued and the jury could properly have inferred that Arroyo used his nine millimeter handgun in the shooting. Looking at the rest of the evidence supporting Arroyo's guilt, including his statements before and after the crimes and the evidence linking him to the jacket worn by the assailant, we are substantially confident that, absent the error, the jury's verdicts would have been the same.[14]

g.  Jury charge.  With regard to the assault and battery by means of a dangerous weapon charge, the judge instructed the jury that, although "[t]he Commonwealth must prove beyond a reasonable doubt that the defendant intended to touch Marie LaBranche with a dangerous weapon[,] . . . [t]he Commonwealth is not required to prove that the defendant specifically intended to cause injury to

---

[14] We must also recognize the anomaly in this particular error, as it was error to have excluded evidence of the shell casings in the first place.

Marie LaBranche. . . . Any slight touching is sufficient as long as it is done with a dangerous weapon." The judge continued to explain the concept of transferred intent: "If you picked out an individual . . . intending to kill him and you . . . missed and hit someone else . . . [t]he law transfers the intent that you had against one person and applies it to the unintended victim . . . ."[15] On appeal, Arroyo argues that this instruction was erroneous because it created "the mistaken impression that the Commonwealth need not prove the requisite intent to commit the battery -- only the act which resulted in the battery." Because defense counsel did not object to the instruction, we review any error to determine whether it created a substantial likelihood of a miscarriage of justice. Commonwealth v. Guy, 441 Mass. 96, 107 (2004). We conclude that the instruction was not erroneous.

Arroyo is mistaken to equate the judge's instruction in this case with those given (and criticized) in Commonwealth v. Garofalo, 46 Mass. App. Ct. 191 (1999), and Commonwealth v. Moore, 36 Mass. App. Ct. 455 (1994). See Commonwealth v. Ford, 424 Mass. 709 (1997). In each of those cases, the error lay in the instructions that the jury need not find "that the defendant specifically intended to touch [the victims]." Id. at 710. Commonwealth v. Garofalo, supra at 192. Commonwealth v. Moore,

---

[15] The complete instruction that the judge gave was more lengthy, generally discussing the elements of the crime and more specifically addressing the dangerous weapon and intent elements, stating three times that the Commonwealth must show that the defendant intended to touch the victim (or, in the case of transferred intent, another intended victim).

supra at 458.  This court and the Appeals Court have concluded that those instructions "impermissibly lowered the Commonwealth's burden of proof regarding the mens rea element of the crime by instructing the jury that all that was necessary for a guilty verdict was a finding that the defendant did an intentional act, the result of which was a touching of the victim."  Commonwealth v. Ford, supra at 712.  Such is not the case here.  The judge's instruction was that the Commonwealth need not prove "that the defendant specifically intended to cause injury to Marie LaBranche" (emphasis added).  This, relating to the concept of transferred intent, is wholly different from an instruction stating that the Commonwealth need not show intent to touch.  The judge correctly instructed that the jury had to find intent to touch.  There was no error.

h.  G. L. c. 278, § 33E.  We have reviewed the law and the evidence of the whole case pursuant to our duties under G. L. c. 278, § 33E, and have found no reason to reverse or to reduce Arroyo's conviction of murder in the first degree.

Accordingly, the judgments are affirmed.

So ordered.