**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                              )
EZEQUIEL ARROYO               )
          Petitioner,         )
                              )
v.                            )      Civil Action No. 05-11277-DPW
                              )
BERNARD BRADY                 )
          Respondent.         )
_____)
```

**RESPONDENT'S MEMORANDUM IN OPPOSITION**
**TO THE PETITION FOR HABEAS CORPUS**

The respondent, Bernard Brady, through counsel, hereby submits his
memorandum of law in opposition to the petition for a writ of habeas corpus filed by
Ezequiel Arroyo ("the petitioner"). As argued in this memorandum, the petition should
be denied where it contains unexhausted claims as well as procedurally defaulted
claims and where the state court's adjudication was not contrary to or an unreasonable
application of clearly established Supreme Court law.

**PRIOR PROCEEDINGS**

On August 3, 1998, a Suffolk County grand jury indicted the petitioner for the first-
degree murder of Luis Rivera, assault and battery with a dangerous weapon on Marie
LeBranche and possession of a firearm without a license (S.A. 1).[1]

On January 26, 1999, the Commonwealth filed a motion for an order to take the
petitioner's blood sample (S.A. 1). On February , 1999, Justice Elizabeth Donovan allowed

---

[1]  The respondent herein references his Supplemental Answer, containing the
state court materials from the petitioner's trial and appeal, as "SA" followed by the
volume and exhibit number. The trial transcripts, which were filed as a further
supplemental answer, will be referenced by volume and page number as (Tr. --/--).

the motion following a hearing (S.A. 1).   On January 16, 2002, immediately prior to trial, the petitioner filed a motion in limine to exclude a green jacket found near the crime scene (S.A. 1).   Justice Charles Spurlock denied this motion after a hearing (S.A. 1).   On the same day, a jury trial commenced before Justice Spurlock and a jury (S.A.1).   The petitioner moved for a required finding of not guilty at the close of the Commonwealth's case, which was denied (S.A. 1).   The petitioner also renewed his objection to the order for his blood sample; this renewed objection was also denied (Tr. IV/97-98).   On January 24, 2002, the jury found the petitioner guilty of all three offenses (S.A.1).

On appeal to the Supreme Judicial Court ("SJC"), the petitioner raised seven claims: 1) that the Commonwealth's evidence was insufficient to support the conviction where the petitioner was never identified as the assailant; 2) that the indictment should have been dismissed for insufficient evidence and because the prosecutor failed to present exculpatory evidence; 3) that there was no probable cause to order the petitioner's blood sample; 4) that the trial court erroneously admitted a green jacket into evidence; 5) that the trial court improperly admitted prejudicial DNA blood evidence without conducting a hearing or inquiry regarding its reliability; 6) that the prosecutor's closing argument was factually unfounded and unfairly appealed to the passions and prejudices of the jury; and 7) that the trial court's charge on assault and battery with a dangerous weapon was plain error  (S.A. 2).   The SJC affirmed the convictions on June 25, 2004.   *Commonwealth v. Arroyo*, 442 Mass. 135, 810 N.E.2d 1201 (S.A. 5).   The petitioner's petition for rehearing was denied on July 21, 2004.

On June 17, 2005, the petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## STATEMENT OF FACTS

The Massachusetts Supreme Judicial Court's recitation of the facts of the petitioner's crimes is entitled to the presumption of correctness under 28 U.S.C. §2254(e)(1).  *See Gunter v. Maloney*, 291 F.3d 74, 76 (1st Cir. 2002); *Sanna v. DiPaolo*, 265 F.3d 1, 7 (1st Cir. 2001); *Coombs v. Maine*, 202 F.3d 14, 18 (1sr Cir. 2000).  The AEDPA presumption of correctness applies to all "basic, primary, or historical facts" underlying the state court's conclusion.  *Gunter v. Maloney*, 291 F.3d at 76; *Sanna v. DiPaolo*, 265 F.3d at 7.  In addition, the presumption of correctness extends to factual determinations made by both state trial and appellate courts.  *Rashad v. Walsh*, 300 F.3d 27, 34 (1st Cir. 2002), and to any factual findings implicit in the state court's ruling.  *LaVallee v. Delle Rose*, 410 U.S. 690, 692 (1972); *Weeks v. Snyder*, 219 F.3d 245, 258 (3d Cir.), *cert. denied*, 531 U.S. 1003 (2000).   As the First Circuit has noted, "[a] habeas petitioner must clear a high hurdle before a federal court will set aside any of the state's factual findings."  *Mastracchio v. Vose*, 274 F.3 590, 598 (1st Cir. 2001).   The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254 (e)(1).

The Supreme Judicial Court found the following facts concerning the petitioner's crimes:

> Shortly after 3 P.M. on May 19, 1998, five shots were fired in front of the Pilgrim Church on Columbia Road in Dorchester, where a crowd was gathered for a clothing sale.  Four of the shots struck Luis Rivera in the chest and in the head, killing him.  One of the shots struck Marie LaBranche in the leg, injuring her.

> Eyewitnesses to the shooting testified that the assailant was a male (of unidentified ethnicity, but who "had white skin"), sixteen to twenty-one years old, between five

feet, three inches and five feet, eight inches tall, "buffed" (as opposed to having a "husky build"), with dark hair and without a hat, wearing brown corduroy trousers, and a green nylon or flight-type jacket.[2]  No eyewitnesses saw the assailant's face, and no one could identify Arroyo as the perpetrator.  At  the time of his arrest, Arroyo, a light-skinned Hispanic male with dark hair, was eighteen years old, five feet, three inches tall, and weighed 140 pounds.

After the shooting, the assailant ran down Columbia Road and turned the corner onto Arion Street.  A resident living at 6 Arion Street testified that he saw a white or Hispanic male wearing a green jacket run up Arion Street, leap a chain link fence to cross into a back yard, and disappear as he ran through that yard toward Virginia Street.

In response to reports of the assailant's flight, police officers searched the area around Arion and Virginia Streets.  Hearing a report that individuals at 9 Virginia Street saw someone run through their yard from Virginia Street toward Monadnock Street, one police officer crossed through that yard and expanded the search toward Monadnock Street.  The assailant was not apprehended, but the police found a nylon green jacket, which appeared to have been discarded recently, lying along a fence at the back of 10 Virginia Street.

A witness to the shooting testified that this green jacket, depicted in a photograph admitted at trial, was "pretty similar" to the jacket that she saw the assailant wearing at the shooting.  After Arroyo's arrest, a criminalist at the Boston police crime laboratory performed polymerase chain reaction (PCR) type deoxyribonucleic acid (DNA) testing on a blood stain found on the exterior right chest of the jacket.[3]  The DNA profile revealed that Arroyo was a possible source of that blood stain, and that only one in 75,000 Caucasians, one in 81,000 Southeastern Hispanics, and one in 1,300,000 African-Americans shared that profile.

---

[2]  The SJC inserted the following footnote:
On cross-examination by defense counsel, a police officer testified that another unidentified person reported to him at the scene that the assailant was Hispanic and was wearing a green or blue jacket, a dark-colored hat, and jeans.

[3]  The SJC inserted the following footnote:
There also were blood stains on the wrist of the jacket.  The Commonwealth suggested a source for the blood stains, presenting evidence at trial to demonstrate that an individual firing a semiautomatic nine millimeter handgun could, with an improper grip on the pistol, receive a cut by the action of the pistol's slide.  However, although the Commonwealth introduced evidence to show that Arroyo was in possession of a nine millimeter handgun on the day of the shooting, it did not present the evidence that he ever received an injury from it or that it was used in the crime.

The Commonwealth also introduced evidence that on the day before the shooting, Eveliz Leon, Arroyo's girlfriend, had become very agitated, had accused Rivera, the deceased victim, of stealing items that belonged to her and to Arroyo, and had asked Arroyo to "do something about it." More specifically, there was testimony that: on May 17, Leon and Arroyo moved in to stay for a period with Leon's cousin, Carmen Torres, who had previously been in a long-term relationship with Rivera, resulting in the birth of her three children; when Leon moved in, she brought three bags of clothing with her, some of which belonged to Arroyo; those clothes were stolen from Torres's apartment on May 18; and Leon and Arroyo believed that Rivera had stolen them.[4]

The next morning at approximately 10 A.M., Torres walked with Leon and Arroyo to a bus stop, where Arroyo and Leon took a bus to a travel agency to purchase airline tickets for them both to travel to Puerto Rico.[5] On the way to the bus stop, the three continued a discussion begun the night before about Rivera's alleged theft of the clothes. To avoid further argument, Torres told Arroyo to "forget about it," and that she would pay for the clothes. Arroyo replied, to the contrary, that he would "take care of [it]." Before Arroyo got on the bus, Torres saw that he was carrying a nine millimeter handgun and wearing a jacket, the color of which she could not remember at trial.[6]

---

[4] The SJC inserted the following footnote:
There was also testimony at trial from Rivera's sister, that on May 18, Rivera had come home with trash bags full of clothing that was not his, that he washed the clothing, and that on the day he was shot he had been wearing some of it.

[5] The SJC inserted the following footnote:
Leon's children were then living in Puerto Rico, and she had been planning to go there. The defendant decided to accompany her at some point on or shortly before May 18. The Commonwealth introduced evidence to show that on May 19 a travel agency sold two tickets to travel on May 24 from Newark, New Jersey to San Juan, Puerto Rico. One ticket was for Leon; the other, however, was for an Alberto Diaz. No evidence was presented regarding the identity of Alberto Diaz, or whether that was an assumed name for the defendant. The name "Alberto Diaz" was redacted and kept from the jury. Torres testified at trial that she saw both tickets, and that one was issued to Leon and the other to Arroyo. The tickets were never used.

[6] The SJC inserted the following footnote:
Nine millimeter shell casings had been found at the scene of the shooting, but were excluded from evidence by the trial judge who ruled, pretrial, that they were not adequately linked to the defendant. We presume that the judge's ruling was based on the consideration that Arroyo's gun was never recovered, tested, and

> Torres next saw Arroyo at some time after 5 P.M. that same day, at a birthday party. He was no longer wearing a jacket. At that time, Torres had not learned of Rivera's death. When Arroyo saw Torres, he said, "I'm sorry," without explanation. He then spoke to Leon, who had returned from the travel agency earlier in the day without Arroyo. Leon asked Torres to move away so that she and Arroyo could talk privately. Within five minutes of arriving, Arroyo left. Later that evening, Leon also left Torres, and Torres did not see either of them again until the time of trial.

*Commonwealth v. Arroyo*, 442 Mass. at 137-139, 810 N.E.2d at 1205-1207; S.A. 5. Other findings of fact by the SJC will be recited herein as they relate to specific issues raised by the petitioner.

## ARGUMENT

### STANDARD OF REVIEW

Because the subject petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act ("the AEDPA"), this Court's review is governed by that act. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Williams v. Matesanz*, 230 F.3d 421, 426 (1st Cir.2000) ("a federal [habeas] court operates within a closely circumscribed sphere"). In relevant part, the AEDPA precludes a federal court from granting habeas relief, unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable

---

matched to the shells. While the lack of such a match may reduce the weight of this evidence, it is not a basis on which to exclude evidence of the shell casings themselves. They tend to prove that the victims were shot with a nine millimeter gun, and are therefore relevant to the circumstances of the shooting. Their relevance is heightened, where, as here, there was testimony that Arroyo possessed such a weapon shortly before the shooting. This evidence was erroneously excluded.

application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. §2254(d)(2). In addition, under the AEDPA, state-court determinations of factual issues "shall be presumed to be correct," unless the petitioner rebuts this "presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1). This "highly deferential standard for evaluating state-court rulings" reflects the overarching structure of the federal habeas corpus scheme, which vests "primary responsibility" for evaluating federal law claims raised in criminal trials in the state courts, courts which must be presumed in habeas corpus courts to know and follow the law. *Woodford v. Visciotti*, 537 U.S.19, 24, 27 (2002) (per curiam).

A state-court decision is "contrary to" clearly established Supreme Court precedent in only two circumstances: (1) "if the state court applies a rule that contradicts the governing law set forth in" Supreme Court cases; or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme court] precedent." *Taylor*, 529 U.S. at 405-06. Under either scenario, to satisfy the "contrary to" clause, the state-court decision must be "substantially different," "diametrically different," "opposite in character or nature," or "mutually opposed" to clearly established Supreme court precedent. *Id.*

A state-court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's

7

case." *Id*. at 413.  In making this determination, a habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409.  The same objective unreasonableness standard applies to the "unreasonable determination of facts prong of § 2254(d)(2).  *Torres v. Prunty*, 223 F.3d 1103, 1108 (9th Cir. 2000).

There is no bright line rule as to what constitutes an "objectively unreasonable" application of federal law or determination of facts.  *Taylor*, 529 U.S. at 410.  As the *Taylor* decision makes clear, however, an unreasonable state-court determination is not the equivalent of an incorrect one.  *Id*.   "Indeed, because Congress used the word 'unreasonable' . . . and not words like 'erroneous' or 'incorrect,' a federal habeas court 'may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application [or determination] must also be unreasonable.'" *Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.) , *cert. denied*, 534 U.S. 925  (2001) (quoting *Taylor*, 529 U.S. at 411).   As this Court sitting en banc held, "'some increment of incorrectness beyond error is required' . . . . The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court."  *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).  If, for instance, the state court reaches a determination that is "devoid of record support for its conclusion or is arbitrary," the AEDPA's unreasonable application prong may be satisfied.  *Id*. at 36-37 (citing *O'Brien v. Dubois*, 145 F.3d 16, 25 (1st Cir. 1998)).   Since "[a]pplying a general

8

standard to a specific case can demand a substantial element of judgment," "[t]he more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." *Yarborough v. Alvarado*, 124 S. Ct. 2140, 2149 (2004). The clearly established law that is relevant to the analysis under § 2254(d)(1) is limited to the holdings of United States Supreme Court cases extant at the time of the state court decision, and does not include the dicta of such cases. *Id*. at 2147; *Williams*, 529 U.S. at 412.

Factual determinations of state courts are granted similar deference. To satisfy § 2254(d)(2), a petitioner must show that the state's factual determination was objectively unreasonable. *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 399 (2000)). Objective unreasonableness is not merely an incorrect or erroneous decision. *Williams*, 529 U.S. at 410; *see also Ward v. Sternes*, 334 F.3d 696, 703-04 (7th Cir. 2003) ("petitioner's challenge to a decision based on a factual determination will not succeed if the petitioner merely evidences that the state court committed error. Instead, he must further establish that the state court committed unreasonable error."); *Dennis v. Mitchell*, 354 F.3d 511, 518 (6th Cir. 2003) ("federal habeas court may not grant habeas relief under § 2254(d)(2) merely because it disagrees with a state trial court's factual determination").

Moreover, § 2254(d)(2) must be interpreted in conjunction with § 2254(e)(1), which specifies both that "a determination of a factual issue made by a State court shall be presumed to be correct," and that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Sanna v. DiPaolo*, 265 F.3d 1, 7. *See also Miller-El,* 537 U.S. at 341 (noting that to prevail under § 2254(d)(2),

habeas petitioner must both disprove the factual finding by clear and convincing evidence and demonstrate that the court's factual determination was objectively unreasonable).

## I.    THE SUPREME JUDICIAL COURT'S HOLDING THAT THE COMMONWEALTH PRESENTED SUFFICIENT EVIDENCE OF THE PETITIONER'S GUILT WAS NOT AN UNREASONABLE APPLICATION OF *JACKSON V. VIRGINIA*.

The petitioner claims that the SJC's decision was contrary to clearly established federal law where the evidence was insufficient to establish the petitioner's guilt beyond a reasonable doubt and therefore his conviction violated his due process rights.  The petitioner's reliance on *Francis v. Franklin*, 471 U.S. 307, 313 (1985) for his due process claim is misplaced because the issue in *Franklin* was whether a jury instruction had the effect of relieving the State of its burden of proof.  The SJC's determination that the Commonwealth presented sufficient evidence to uphold the petitioner's conviction was not contrary to or an unreasonable application of the holding in *Francis*.

In determining whether the Commonwealth's evidence was sufficient, the SJC used the standard set forth in *Commonwealth v. Latimore*, 378 Mass. 671, 677, 393 N.E.2d 370 (1979).  Under *Latimore*, the evidence is sufficient if any rational trier of fact, having heard the evidence and drawn reasonable and permissible inferences therefrom, could find each and every element beyond a reasonable doubt.  *Latimore*, 378 Mass. at 677, 393 N.E.2d at 374.  Moreover, in *Latimore*, the Massachusetts Supreme Court held that that standard of review is the functional equivalent and "substantially comparable" to the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307 (1979).  *Id.*

Since the SJC applied the proper Supreme Court precedent to the petitioner's sufficiency of the evidence claim, this court must now determine whether the state court's

decision was an unreasonable application of *Jackson v. Virgina*, *supra*. *See Hurtado v. Tucker*, 245 F.3d 7, 15 (1st Cir. 2001). As this court made clear in *Hurtado*, "[h]abeas review involves the layering of two standards. The habeas question of whether the state court decision is objectively unreasonable is layered on top of the underlying standard governing the constitutional right asserted." *Id.* at 16. Here, as in *Hurtado,* the "constitutional right is governed by *Jackson*'s test of 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"*Jackson*, 443 U.S. at 319.

Here, although the Commonwealth did not present any direct evidence that Arroyo was the assailant, there was ample circumstantial evidence and the reasonable inferences therefrom to demonstrate the reasonableness of the SJC's determination. As the SJC found:

> the jury could have found that Arroyo had a motive to murder Rivera (the theft of his and Leon's clothing), an intention to confront Rivera and to injure LaBranche (a nine millimeter handgun), and a plan to flee to Puerto Rico to evade detection and arrest. In addition, they could have found that Arroyo generally fit the description of the assailant given by the eyewitnesses who testified, and that the green jacket worn by the assailant and discarded by him shortly after the shooting along his path of flight had been worn and discarded by Arroyo that day. Finally, they could have concluded that Arroyo's unexplained apology to Torres that evening, before the victim's death was known to her, was an apology for killing the father of her children just hours before.

*Commonwealth v. Arroyo*, 442 Mass. at 140, 810 N.E.2d at 1207.

Other circumstantial evidence further strengthened the basis for the jury's verdict. On the day before the murder, when petitioner's girlfriend (Leon) stated that she wanted petitioner to do something about the victim taking their clothes, the petitioner said that he would "take care of it." (Tr. III/52-53, 61-63, 105-106). On the morning of the murder,

when Torres offered to pay for the stolen clothes, the petitioner adamantly repeated that he would "take care of it" (Tr. II/108). At that time, Torres saw a gun in the petitioner's pants (Tr. III/109).

At approximately 3:15 p.m. on the same day, the murder victim, who was wearing the petitioner's stolen pants and boots, was shot four times and Marie LaBranche was shot in the leg (Tr. II/41-42, 49-51, 83-85, 101-103, 127-128). Eyewitnesses could not identify the shooter's face, but observed that he was wearing a green jacket and that he ran up Arion Street along a fence (Tr. II/41-42, 45, 51-54, 60, 62-64). An investigating police officer found a green jacket near a fence on Arion Street (Tr. II/160, 164-165). At trial, Donna DeWar, an eyewitness to the shooting, testified that a photograph of this jacket was "pretty similar" to the green jacket that she had seen the shooter wearing on that day (Tr. II/43). After the shootings, Torres saw the petitioner at a birthday party and noticed that he no longer had the jacket that he had been wearing earlier (Tr. III/119). After mysteriously telling Torres that he was sorry, the petitioner secretly spoke with Leon and left the party with her shortly thereafter (Tr. III/116, 118). The petitioner was arrested pursuant to an arrest warrant on June 10, 1998, over two weeks after the shooting, in Fitchburg, Massachusetts, even though he resided in Framingham, Massachusetts (Tr. IV/10-11, 43).

Senior criminalists at the Boston Police Crime Laboratory determined that the green jacket retrieved from near the crime scene had blood stains on it that matched the petitioner's DNA profile (Tr. IV/65-66, 87-89). Less than one hundredth of one percent of the population has the particular DNA profile that was found on the green jacket (Tr. IV/90).

"The ultimate question on habeas review. . . is not how well reasoned the state court

12

decision is, but whether the outcome is reasonable." *Hurtado*, 245 F.3d at 20, citing to *O'Brien v. DuBois*, 145 F.3d 16, 25 (1st Cir. 1998). From the above evidence, the SJC's decision that the petitioner was properly found guilty of the crimes charged was abundantly reasonable. The petitioner has offered nothing, let alone clear and convincing evidence, to rebut the presumed correctness under 28 U.S.C. §2254(e)(1) of the SJC's findings of fact, *see Avellar v. DuBois*, 30 F.Supp.2d at 79; *Otsuki v. DuBois*, 994 F.Supp. at 51 & n.3, which includes deference to inferences drawn by the state court from those factual determinations. *See Parke v. Raley*, 506 U. S. at 35; *Flores v. Marshall*, 53 F.Supp.2d at 514. All of the evidence, taken together with the reasonable inferences therefrom and in the light most favorable to the Commonwealth, constituted sufficient evidence from which a rational jury could have found the elements of the crimes charged beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. The petitioner is not entitled to habeas relief on this claim.

## II.    THE PETITIONER'S FOURTH AMENDMENT CLAIM IS BARRED FROM HABEAS REVIEW BY *STONE v. POWELL.*

Prior to the petitioner's state court trial, the Commonwealth filed a pre-trial motion for an order to take a blood sample from the petitioner. See S.A. Vol. I, Ex. 1 (R.A. 130-133). Justice Elizabeth Donovan conducted a non-evidentiary hearing on the motion on February 3, 1999. See S.A. Vol. I, Ex. 1 (R.A. 135-144) and subsequently allowed the motion. See S.A. Vol. 1, (R.A. 134). On appeal the petitioner claimed that the Commonwealth lacked probable cause for the seizure. The SJC held that the Commonwealth satisfied the constitutional burden under the Fourth Amendment where it adequately demonstrated that a sample of the petitioner's blood would probably produce

evidence relevant to the question of the his guilt. See S.A. Vol. 1, Ex. 5. N o w , t h e petitioner presents his Fourth Amendment claim to the federal habeas court, contending that the trial court erred in allowing the motion for blood sample. See Pet. Mem., pp. 18-20. Specifically, he alleges that the Commonwealth failed to show probable cause that the blood sample would produce relevant evidence. *Id*.

This claim, which is based upon the Fourth Amendment guarantee against illegal searches and seizures, is foreclosed from habeas review under the rule of *Stone v. Powell*, 428 U.S. 465 (1976); *see Parmigiano v. Houle*, 618 F. 2d 877 (1st Cir. 1980). It is well settled that, where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner cannot obtain habeas corpus relief on the grounds that evidence obtained through an unconstitutional search and seizure was introduced at his trial. *See Tart v. Massachusetts*, 949 F. 2d 490, 497 n. 6 (1991); *McCown v. Callahan*, 726 F. 2d 1,4 (1st Cir. 1984). The holding in *Stone v. Powell* is grounded in the Supreme Court's conclusion that in cases where a Fourth Amendment claim has been adequately litigated in the state courts, the costs of applying the exclusionary rule on habeas review - in terms of judicial efficiency, comity, federalism and finality - outweigh any deterrent and educative advantage to be gained. *Id*. at 493-494; *See Withrow v. Williams*, 507 U.S. 680, 113 S.Ct. 1745, 123 L.Ed. 2d 407 (1993)(*Stone* bar rests on prudential concerns). Absent a clear showing that the state court did not afford an adequate opportunity for the petitioner to litigate the issue, principles of comity require that federal habeas review of Fourth Amendment claims be declined. *Tart v. Massachusetts*, 949 F. 2d at 497 n.6. The petitioner had the opportunity to litigate the search and seizure issue

14

in the state court and is barred from renewing this issue in the federal courts.

**III.    CLAIM FOUR AND PART OF CLAIM TWO ARE PROCEDURALLY DEFAULTED AND PETITIONER HAS FAILED TO SHOW CAUSE FOR AND PREJUDICE FROM THE DEFAULT OR THAT HE IS ACTUALLY INNOCENT.**

It is well-established that federal habeas review of a claim is precluded when the state court has decided that issue on the basis of an adequate and independent state ground. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Harris v. Reed*, 489 U.S. 255, 262 (1989); *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977). The "procedural default rule" reflects the Supreme Court's view that, in the interests of comity and federalism, a habeas court should "'not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Boutwell v. Bissonnette*, 66 F.Supp.2d 243, 245 (D. Mass. 1999), *quoting Coleman*, 501 U.S. at 729. *See also Edwards v. Carpenter*, 529 U.S. 446, 450 (2000). As a consequence of this rule, "state prisoners whose claims are dismissed by state courts for procedural reasons cannot gain access to federal habeas review." *Boutwell v. Bissonnette*, 66 F.Supp.2d at 245 (citations omitted).

A state decision based on the failure to properly raise an issue on appeal constitutes an adequate and independent state ground, as does the failure to lodge a contemporaneous objection at trial. *See, e.g., Coleman*, 501 U.S. at 729-30 (untimely filing of notice of appeal); *Murray v. Carrier*, 477 U.S. 478, 481-82 (1986) (failure to raise claim on appeal); *Wainwright*, 433 U.S. at 86-87 (contemporaneous objection). For habeas purposes, the federal courts do not infer waiver of a procedural bar "unless the state appellate court has made it 'reasonably clear that its reasons for affirming a conviction rest

upon its view of federal law.'" *Tart v. Massachusetts*, 949 F.2d 490, 496 (1st Cir. 1991), *quoting Doucette v. Vose*, 842 F.2d 538, 540 (1st Cir. 1988). *See also Puleio v. Vose*, 830 F.2d 1197, 1200 (1st Cir. 1987), *cert denied*, 485 U.S. 990 (1988). Indeed, habeas review is allowed only if "the relevant state court decision . . . fairly appear[s] to rest primarily on federal law or [is] interwoven with [federal] law." *Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991). *See Coleman*, 501 U.S. at 734, 735.

Massachusetts has a "long-standing rule that issues not raised at trial ... are treated as waived." *Commonwealth v. Curtis*, 417 Mass. 619, 632 N.E.2d 821, 827 (Mass. 1994). The First Circuit has repeatedly recognized that "Massachusetts has ... routinely enforced, [and] consistently applied [the] contemporaneous objection rule," which requires a party to object to a perceived trial error at the time the error occurs to preserve the issue for appellate review. *See Burks v. Dubois*, 55 F.3d 712, 716 (1st Cir. 1995) (collecting cases); *see also Brewer*, 119 F.3d at 1001 (describing Massachusetts' contemporaneous objection rule as "firmly entrenched"). Where, as here, a party fails to make a timely objection, appellate review under Massachusetts law is limited to determining whether the alleged error posed a risk of a miscarriage of justice. *See Burks*, 55 F.3d at 716, n. 2; *Commonwealth v. Beldotti*, 409 Mass. 553, 567 N.E.2d 1219, 1225 (1991) (same); *Commonwealth v. Harrington*, 379 Mass. 446, 399 N.E.2d 475, 478 (Mass. 1980).

The petitioner did not object to the expert witness testimony regarding the DNA evidence or to the part of the prosecutor's closing argument in which he argues that the murder weapon was a nine millimeter handgun. In order to preserve objections to DNA analysis in Massachusetts, a petitioner "must file an appropriate pre-trial motion stating the

grounds for the objection and requesting a hearing." *Commonwealth v. Arroyo*, 442 Mass. at 145, 810 N.E.2d at 1210, quoting *Canavan's Case*, 432 Mass. 304, 309-312, 733 N.E.2d 1042 (2000). Because the petitioner did not file such a motion, the SJC found that he had waived his opportunity to challenge the reliability of the testing and the conclusions reached. *Id.* This determination constitutes an "adequate and independent state law ground" within the meaning of the procedural default rule, thereby precluding habeas review. *See Brewer v. Marshall*, 119 F.3d 993, 999 (1st Cir. 1997), *cert. denied*, 522 U.S. 1151 (1998). The SJC also found that petitioner failed to object to the closing argument regarding the nine millimeter handgun and therefore the court's review was limited to whether there was a substantial likelihood of a miscarriage of justice. *Arroyo*, 442 Mass. at 146, 147, 810 N.E.2d at 1211-1212. Where the state court expressly determines that the claim is waived, the petitioner cannot now receive habeas review of that claim. *Murray,* 477 U.S. at 481-82.

Habeas review of a procedurally defaulted claim is precluded unless "petitioner can demonstrate cause for the default and prejudice stemming therefrom, or alternatively, unless the petitioner can show that a refusal to consider the merits of the constitutional claim will work a miscarriage of justice." *Harris*, 489 U.S. at 262. *Accord, Coleman*, 501 U.S. at 749-50; *Burks v. DuBois*, 55 F.3d 712, 716 (1st Cir. 1995). The "miscarriage of justice" exception to a showing of cause and prejudice is "'seldom to be used, and explicitly tied to a showing of actual innocence.'" *Killela v. Hall*, 84 F.Supp. 2d 204, 210 (D. Mass. 2000), *quoting Burks*, 55 F.3d at 717. In this case, the petitioner has made no attempt to demonstrate any of these, nor could he.

17

"To excuse a procedural default, a petitioner's cause must relate to an objective factor, external to the defense, that thwarted (or at least substantially obstructed) the efforts of the defendant or his counsel to obey the state's procedural rule." *Burks*, 55 F.3d at 716-17, citing *Murray*, 477 U.S. at 488. The Supreme Court has recognized three objective factors, external to the defense, that are sufficient to constitute cause to excuse a procedural default: (1) the factual or legal basis for a claim was not reasonably available; (2) interference by state officials that made compliance with the state procedural rules impracticable; or (3) attorney error rising to the level of constitutionally ineffective assistance of counsel. *Coleman*, 501 U.S. at 751; *Murray*, 477 U.S. at 488. *See also Edwards*, 529 U.S. at 451.

The only potential cause available to the petitioner is alleged attorney error or oversight in failing to timely object and prejudice stemming therefrom. It is well settled, however, that attorney error or oversight is not sufficient cause for excusing a procedural default unless it rises to the level of constitutional ineffective assistance. *Burks*, 55 F.3d 712. On appeal, petitioner alleged that his attorney's failure to object to the admission of the expert testimony constituted ineffective assistance of counsel (S.A. Vol. I, Ex. 2, pp. 38-39). The SJC, however, held that he "failed to allege any facts that would suggest that such an objection would have succeeded and that he was thereby prejudiced by its absence." *Arroyo*, 442 Mass. at 145, 810 N.E.2d at 1211. Where the SJC properly found that there was a basis to conclude that the expert testimony was without adequate scientific basis, the petitioner cannot rely on ineffective assistance as cause for his procedural default on the expert testimony claim. Furthermore, in determining that the

prosecutor's argument concerning the nine millimeter handgun did not present a substantial likelihood of a miscarriage of justice, the SJC noted that this was the same standard the court would apply in considering whether defense counsel's failure to object constituted ineffective assistance of counsel. *See Arroyo*, 442 Mass. at 148 n.13, 810 N.E.2d at 1212 n.13.

The petitioner has also failed to allege sufficient prejudice stemming from the procedural default of these claims. Prejudice requires the petitioner to demonstrate "not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Ortiz v. DuBois*, 19 F.3d 708, 714 (1st Cir. 1994), *cert. denied*, 513 U. S. 1085 (1995), *quoting United States v. Frady*, 456 U. S. 152, 170 (1982).

In this case, the expert witness testified that the statistical DNA profile information was generally accepted in the scientific community (Tr. IV/90-91) and detailed his background and accreditation in the field of forensic DNA (Tr. IV/76-79). Moreover, the expert testified only that the petitioner was a possible source of the DNA on the green jacket found near the scene of the shooting (Tr. IV/87-90). Under these circumstances, the petitioner cannot show that the admission of the DNA evidence worked to his substantial disadvantage.

Nor can the petitioner show substantial prejudice stemming from the default of his closing argument claim. Although the prosecutor improperly referred to facts not in evidence when he argued that the victim was killed with a nine millimeter handgun, the SJC found that even without that assertion, the "jury could properly have inferred that the petitioner used his nine millimeter handgun in the shooting." *Arroyo*, 442 Mass. at 148,

19

810 N.E.2d at 1213.  Moreover, the SJC held, *sua sponte*, that evidence of nine millimeter shell casings found at the scene of the shooting was erroneously excluded by the trial judge prior to trial, *Arroyo*, 442 Mass. at 139, n.5, 810 N.E.2d at 1206, and therefore recognized the anomaly in this claim of error. *Id*. at 148 n. 14.

The only other avenue of relief, that a refusal to hear the claims would result in a "miscarriage of justice," is foreclosed.   The petitioner could make no demonstration to this habeas court that he is actually innocent.  "To establish actual innocence,'petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Simpson v. Matesanz*, 175 F. 3d at 210, quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citations omitted).  As set forth in Argument I, supra, the circumstantial evidence and reasonable inferences therefrom were sufficient to find the petitioner guilty beyond a reasonable doubt.  The petitioner has not established that a refusal to hear the two defaulted claims would result in a miscarriage of justice.  Habeas review of the claims is therefore barred by procedural default.

## IV.    THE SJC'S HOLDING THAT THE COMMENTS IN THE PROSECUTOR'S CLOSING ARGUMENT REGARDING THE DEMOGRAPHIC STATISTICS OF BOSTON WERE HARMLESS ERROR WAS NOT CONTRARY TO OR AN UNREASONABLE APPLICATION OF SUPREME COURT LAW NOR DID THE ERROR HAVE A SUBSTANTIAL AND INJURIOUS EFFECT ON THE JURY'S VERDICT.

### A.    *This claim is unexhausted.*

It is well-established that "a federal court should not consider questions posed in a habeas petition until the 'power of the highest state court in respect to such questions' has been exhausted."  *Mele v. Fitchburg District Court*, 850 F.2d 817, 819 (1st Cir. 1988), *quoting United States ex rel. Kennedy v. Tyler*, 269 U.S. 13, 17 (1925).  *See Rose v.*

*Lundy*, 455 U.S. 509, 518-19 (1982); *Adelson v. DiPaola*, 131 F.3d 259, 261-262 (1st Cir. 1997); *Dougan v. Ponte*, 727 F.2d 199, 202 (1st Cir. 1984); 28 U.S.C. §2254(b)(1)(A).  The exhaustion principle, in addition to ensuring that state courts have the first opportunity to correct their own constitutional errors made in their proceedings, enables federal courts to accord appropriate respect to the sovereignty of the states and promotes comity by "minimiz[ing] friction between our federal and state systems of justice."  *Rose*, 455 U.S. at 518.  *See Duncan v. Henry*, 513 U.S. 364, 365-366 (1995); *Duckworth v. Serrano*, 454 U.S. 1, 3 (1984); *Scarpa v. DuBois*, 38 F.3d 1, 6 (1st Cir. 1994), *cert. denied*, 513 U.S. 1129 (1995); *Mele*, 850 F.2d at 819.  *See also Ex parte Royall*, 117 U.S. 241, 251 (1886)(state and federal courts are "equally bound to guard and protect rights secured by the Constitution").

A claim  in state court that contains a mere inkling of a federal claim, not one "likely to alert the court to the claim's federal nature," will not suffice for exhaustion purposes. *Nadworny v. Fair*, 872 F.2d 1093, 1098 (1st Cir. 1989), quoting *Daye v. Attorney General of New York*, 696 F.2d 186, 192 (2d Cir. 1982) (en banc), *cert. denied*, 464 U.S. 1048 (1984).  *See Scarpa v. DuBois*, 38 F.3d at 6.  It also is not enough that all the facts necessary to support the federal claim were before the state court, or that a somewhat similar state-law claim was made.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 276-277 (1971).  *See Duncan v. Henry*, 513 U.S. at 366.  Indeed, "[t]he exhaustion requirement requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.  The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined.  Oblique

references [that] hint that a [federal] theory may be lurking in the woodwork will not turn the exhaustion trick." *Martens v. Shannon*, 836 F.2d 715, 717 (1st Cir. 1988). It is the petitioner's heavy burden to demonstrate that his now claimed federal errors were fairly presented to the state's highest court. *Nadworny v. Fair,* 872 F.2d 1093, 1098 (1st Cir. 1989). In order for it to be said that the petitioner has exhausted his state remedies as to his federal habeas claims, he must have presented the state court with appropriate federal trappings such as:

> specific constitutional language, constitutional citation, appropriate federal precedent, substantive constitutional analogy, argument with no masking state-law character, ... such as would in all likelihood alert a reasonable jurist as to the existence of the federal question.

*Id*. at 1101. "The fewer the trappings that adorn a petitioner's state-court filings, the less likely that [a federal court] will find his federal claim to have been exhausted." *Adelson*, 131 F.3d at 262.

The petitioner's last claim is that the prosecutor violated his due process rights by arguing facts that were not in evidence in his closing argument, specifically facts regarding the demographic statistics of Boston as they related to the DNA evidence. In his habeas memo, he cites to *Darden v. Wainwright*, 477 U.S. 168 (1986) and *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) as a basis for his federal due process argument. See Pet. Memo, pp. 9, 18. However in his brief to the SJC, the petitioner merely stated the federal nature of his claim in the heading of the argument and cited to Massachusetts standards and caselaw throughout his argument. See S.A. Vol. I, Ex. 2, pp. 39-48. *See Gagne v. Fair*, 835 F.2d 6, 7 (1st Cir. 1987) (citation to constitutional right in issue caption was insufficient to satisfy exhaustion requirement). The failure to present the federal

22

nature of the claim is further evidenced in the state court opinion, in which the SJC analyzes the claim under state law standards. *See Arroyo*, 442 Mass. at 145-148, 810 N.E.2d at 1211-1213; S.A. Vol. I, Ex. 5. Therefore this claim is unexhausted and the petition should either be dismissed as containing unexhausted claims or the petitioner should opt to go forward on the remaining exhausted claims.

### B.    Even if Exhausted, Habeas Relief Must Be Denied.

If the court determines that the petitioner sufficiently raised the federal nature of the claim to the SJC, habeas relief is nevertheless unavailable. The petitioner claims that the prosecutor's improper reference to facts that were not in evidence violated his due process rights. The fact relevant to this claim are as follows:

> After noting the DNA profile ratios, the prosecutor said:
>
> Now let's assume- look at the number of people who live in Boston. Six hundred thousand people or so, give or take. Let's assume there are eight white people with that DNA profile, given these numbers. We assume half the people in Boston are white. Eight.
>
> What else can we assume about that general population of people in Boston who are white and have that DNA profile? How many guys fit that profile? Well, forget about the black guys, ladies and gentlemen, because the shooter wasn't black. That's not-- that's the shooter's jacket. The shooter's description isn't black. . .
>
> Light-skinned Hispanic. A man. Half the people in the general population are not men. So, from that eight or so people, cut it down to four. How many of the people in the general population with that profile are likely to be sixteen to twenty-one years old, young looking? You've got to lose at least one or two guys right there. How many people are left that fit the description of the shooter and can possibly have the defendant's DNA profile? Aren't we getting down to one, light-skinned; height, five-three, five-six, shorter than average? How many people are left? I suggest to you, ladies and gentlemen, the only one left is this man right here, that it's his blood on the jacket.

(Tr. Vol. V/68-69). At the close of the prosecutor's closing argument, defense counsel

objected to this part of the argument.  (Tr. V/76-77).  The trial judge agreed and instructed the jury to disregard that portion of the argument (Tr. V/78).

In analyzing this claim, the SJC did not hold that the prosecutor's comment infringed on constitutional rights.  Rather, while it acknowledged that the prosecutor's reference to facts not in evidence was improper it did not find any constitutional violation warranting harmless error analysis.[7]   *Arroyo*, 442 Mass. at 145-148.   Instead, it held that the prosecutor's lapses were not prejudicial when viewed in the context of the entire trial and the limiting instruction.  *Id.* at 148.   In making this determination, the court reviewed the claim with reference to four factors identified by the SJC in in *Commonwealth v. Kater*, 432 Mass. 404, 422-423, 734 N.E.2d 1164 (2000)[8] and concluded that although the petitioner objected to the argument, and the connection between the jacket and Arroyo was close to the heart of the Commonwealth's case, the trial judge explicitly instructed the jury to disregard the demographic data and when considered in conjunction with the rest of the evidence, the improper evidence did not make a difference in the jury's conclusion. *Arroyo*, 442 Mass. 148.

The SJC's analysis was entirely consistent with clearly established Supreme Court precedent.   Where, as here, a defendant alleges that a prosecutor used improper

---

[7] Moreover, the petitioner's failure to use the harmless beyond a reasonable doubt standard in his brief to the SJC constitutes a procedural default and he has failed to show cause therefore or prejudice therefrom.  See Argument III, supra.

[8] The four factors are: "1) whether the defendant seasonably objected; 2) whether the error was limited to collateral issues or went to the heart of the case; 3) what specific or general instructions the judge gave the jury which may have mitigated the mistake; and 4) whether the error, in the circumstances, possibly made a difference in the jury's conclusions."

24

comments to secure a conviction, the "relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. at 643.  In making this determination, the Supreme Court has cautioned that courts must be careful not to view the prosecutor's comments in artificial isolation, but rather must view those comments in the context of the entire proceeding to determine whether the prosecutor's comments so affected the fairness of the defendant's trial that a new trial is warranted.  *United States v. Young*, 470 U.S. 1, 1-12 (1985).  In making this determination, the First Circuit has stated that courts should consider several factors, including "'(1) the severity of the misconduct; (2) the context in which it occurred; (3) whether the judge gave any curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant.'"  *United States v. Derman*, 211 F.3d 175, 179, n.5 (quoting *United States v. Rodriquez-De Jesus*, 202 F.3d 482, 485 (1st Cir. 2000)); *see also United States v. Glantz*, 810 F.2d 316, 319 (1st Cir.) (relying on same factors in reversing district court's grant of new trial based on prosecutorial misconduct in closing argument), *cert. denied*, 482 U.S. 929 (1987).  These four factors are substantively identical to the factors relied on by the SJC in reaching its objectively reasonable determination that, viewed in the proper context of the entire trial, the prosecutor's challenged comments did not undermine the petitioner's constitutional right to a fair trial.  *See Pagano*, 710 N.E.2d at 1039.  Therefore, the SJC's analysis of Arroyo's closing argument claim could not have been contrary to clearly established Supreme Court precedent.  *See Taylor,* 529 U.S. at 404-05.

Nor was the SJC's decision an unreasonable application of *Darden* or *Donnelly.* The improper argument regarding the demographic statistics was merely an expansion on the properly admitted DNA evidence which supported a strong inference that the petitioner was the source of the blood on the green jacket.  More importantly, any impropriety was removed by the trial judge's immediate and specific instruction to disregard that part of the argument.  *See Donnelly*, 416 U.S. at 644-645 (no violation of due process where improper comment cured by court's curative instructions to jury).  See also *McInerney v. Berman*, 621 F.2d 20, 24 (1st Cir.) ("A reasonable juror can be expected to listen to all he/she is told to by the judge . . ."), *cert. denied*, 449 U.S. 867 (1980).

The SJC also reasonably determined that the prosecutor's comments did not affect the jury's verdict.  As set forth in Argument I, supra, there was ample circumstantial evidence tying the petitioner to the shooting and to support the court's conclusion that the error made a difference in the jury's conclusions.  The petitioner argues that this error should be considered together with the prosecutor's other misstatement in his closing argument regarding the fact that the casing recovered at the scene of the shooting were nine millimeter casings, the same caliber as the petitioner's firearm (Pet. memo, pp. 11-14).  However, the SJC correctly found that the evidence regarding the shell casings at the scene were improperly excluded from evidence.  *See Arroyo*, 442 Mass. 139 n.5, 148 n.14.

To the extent there was any constitutional error in the exclusion of the evidence, it did not have a substantial and injurious effect in determining the jury's verdict.  *See Brecht v. Abrahamson*, 507 U. S. 619, 637 (1993)(the appropriate harmless error standard to be applied in the habeas context); *Kotteakos v. United States*, 328 U. S. 750, 776 (1946).  The

26

*Brecht* standard is far more lenient toward the government than the beyond a reasonable doubt standard of *Chapman v. California*, 386 U. S. 18 (1967), however, it is the respondent's burden to establish harmlessness under the *Brecht* standard. *O'Neal v. McAninch*, 513 U. S. 432, 437-444 (1995). A review of the evidence amply demonstrates that the respondent has met that burden. "[G]ranting habeas relief merely because there is a 'reasonable possibility' that trial error contributed to the verdict . . . is at odds with the historic meaning of habeas corpus — to afford relief to those whom society has 'grievously wronged.'" *Id., quoting Chapman v. California*, 386 U. S. at 24. For all of the reasons already discussed, that standard has not been satisfied here.

## CONCLUSION

For the foregoing reasons, this court should deny the petition for habeas corpus.


Respectfully submitted,

THOMAS F. REILLY
ATTORNEY GENERAL

/s/ Susanne G. Reardon
Susanne G. Reardon
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200
BBO No. 561669


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the attached documents was served upon Donald Harwood, 305 Broadway, 7th Floor, New York, NY 10003, by first class mail, postage pre-paid, on July 29, 2005.

/s/ Susanne G. Reardon
Susanne G. Reardon
Assistant Attorney General