UNTED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| EZEQUIEL ARROYO, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 05-11277-DPW |
| V. | ) | |
| | ) | |
| BERNARD BRADY, | ) | |
| | ) | |
| Respondent | ) | |
| _____ | ) | |

**PETITIONER'S REPLY MEMORANDUM TO RESPONDENT'S MEMORANDUM
IN OPPOSITION TO THE PETITION FOR HABEAS CORPUS**

DONALD A. HARWOOD, ESQ.
ITKOWITZ & HARWOOD
305 Broadway, 7th Floor
New York, NY  10007
(212) 822-1400
BBO#  225110

UNTED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EZEQUIEL ARROYO,                )
                               )
            Petitioner,         )     Civil Action No. 05-11277-DPW
V.                             )
                               )
BERNARD BRADY,                  )
                               )
            Respondent          )
_____       )

**PETITIONER'S REPLY MEMORANDUM TO RESPONDENT'S MEMORANDUM
IN OPPOSITION TO THE PETITION FOR HABEAS CORPUS**

DONALD A. HARWOOD, ESQ.
ITKOWITZ & HARWOOD
305 Broadway, 7th Floor
New York, NY  10007
(212) 822-1400
BBO#  225110

## Preliminary Statement

This Reply Memorandum of Law is respectfully submitted by the Petitioner, Ezequiel Arroyo ("Petitioner" or "Arroyo"), in response to Respondent's Memorandum in Opposition to the Petition for Habeas Corpus ("R.Mem."). As more fully set forth below, this Court should reject Respondent's arguments and grant the within Petition, ordering a new trial and Petitioner's release from unlawful confinement.

### ARGUMENT

I. **THE SJC'S HOLDING THAT THE COMMONWEALTH PRESENTED SUFFICIENT EVIDENCE OF THE PETITIONER'S GUILT WAS AN UNREASONABLE APPLICATION OF JACKSON V. VIRGINIA, AND THUS, THE CONVICTIONS VIOLATE DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS.**

### A.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas relief is permitted where the state court's adjudication:

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

1

28 U.S.C. §2254(d). "This provision governs not only pure issues of law, but mixed questions of law and fact in which legal principles are applied to historical facts." Id., citing Trice v. Ward, 196 F.3d 1151, 1169 (10th Cir. 1999).

As the Respondent concedes in its Brief (p. 7-8), a state-court decision may involve an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Williams v. Taylor, 529 U.S. 362, 413 (2000). "[S]ome increment of incorrectness beyond error is required'. . . .The increment need not necessarily be great; but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002), quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000). If, for instance, the state court reaches a determination that is "devoid of record support for its conclusion or is arbitrary," the AEDPA's unreasonable application prong may be satisfied. McCambridge, *supra*, 303 F.3d at 36-37.

2

Admittedly, "a determination of a factual
issue made by a State court shall be presumed to be
correct," and the petitioner has the burden of
rebutting the presumption of correctness by clear and
convincing evidence. 28 U.S.C. § 2254(e)(1).
Nevertheless, the Court in Taylor, *supra*, made clear
that ultimately,

> . . .[T]he statute [AEDPA] directs
> federal courts to attend to every state-
> court judgment with utmost care, but it
> does not require them to defer to the
> opinion of every reasonable state-court
> judge on the content of federal law.
> *If, after carefully weighing all the
> reasons for accepting a state court's
> judgment, a federal court is convinced
> that a prisoner's custody. . . violates
> the Constitution, that independent
> judgment should prevail.*

529 U.S. at 389 (emphasis added).

## B. *Discussion*

In this case, the state court's adjudication
of his due process claim regarding the sufficiency of
the evidence constituted an "unreasonable
determination of the facts" in light of the evidence
adduced in the state court proceeding. 28 U.S.C.
§2254(d); Williams v. Taylor, 529 U.S. at 399.

At the outset, Respondent claims that
Petitioner incorrectly relies in its Opening

3

Memorandum upon Francis v. Franklin, 471 U.S. 307
(1985), a Supreme Court case which reiterates the
well-founded principle that due process protects the
accused against conviction except upon proof beyond a
reasonable doubt of every fact necessary to constitute
the crime charged, id. at 313. According to
Respondent, Petitioner should refer to the Supreme
Court's decision in Jackson v. Virginia, 443 U.S. 307
(1979), which sets forth the applicable test of
whether, "after viewing the evidence in the light most
favorable to the prosecution, any rational trier of
fact could have found the essential elements of the
crime beyond a reasonable doubt." Id. at 319.

Respondent's argument is perplexing since
Petitioner, in the second sentence of his Opening
Memorandum (p. 4) -- and in page 22 of his state court
brief (see Respondent's Supplemental Answer, Volume I,
Exhibit "2", hereinafter "S.A. Vol.I/2") -- expressly
cites to the Jackson case as governing his sufficiency
claim, as well as to the standard set forth in
Commonwealth v. Latimore, 378 Mass. 671, 677 (1979),
which the SJC applied in affirming Petitioner's
conviction, and which Respondent concedes, is the

4

"functional equivalent" of the Jackson standard
(R.Mem. 10).

In any event, Respondent goes on to address the
merits of Petitioner's sufficiency claim, arguing that
the SJC applied the proper Supreme Court precedent,
i.e., the Jackson test or its functional equivalent
(Latimore, supra), and that the facts adduced at the
state trial reasonably supported the SJC's
determination affirming the conviction (R.Mem. 11-13).

To the contrary, the SJC's application of the
facts in Petitioner's case was unreasonable, the
evidence was plainly insufficient to establish
Petitioner's guilt beyond a reasonable doubt, and the
petition for habeas relief should be granted.

Respondent concedes that, "the Commonwealth did
not present any direct evidence that Arroyo was the
assailant" (R.Mem. 11). It is undisputed that none of
the witnesses to the crime identified the Petitioner
as the assailant (see Petitioner's state-court Brief,
S.A. Vol.I/2, pp. 4-7, 22-23, with citation to the
trial transcript, S.A. Vol. II/1, Trial Transcript,
Volume Two, pages 30-56, 89-93, hereinafter "T.II/30-
56, 89-93"). Indeed, none of the civilian witnesses
to the crime, including Donna Dewar, Norma Serrano,

Helen Fitzpatrick and John Alves, was even asked whether they could identify the Petitioner as the assailant who fled from the scene (*see* Petitioner's state-court Brief, S.A. Vol.I/2, pp. 4-7, 22-23, with citation to the trial transcript, S.A. Vol.II/1, T.II/30-56, 89-93).

Nor was there any forensic evidence at the scene, such as fingerprint or blood evidence, which sufficiently established Petitioner's guilt. At most, the Commonwealth presented evidence that a green jacket, which was recovered by police along a fence on Virginia Street a substantial distance from the crime scene at 547 Columbia Road (T.II/160, S.A.Vol. II/1; T.III/25-26, S.A. Vol.II/2), contained blood which fit the DNA profile of Arroyo, thereby indicating he was a *possible* source of the blood (T.IV/65-66,87-89, S.A. Vol.II/3). However, the green jacket was concededly never identified as having belonged to Arroyo or been worn by him. Nor, for that matter, was the jacket ever positively identified as having been worn by the assailant. Donna Dewar identified a police photograph of a green jacket lying next to a fence as only being "pretty similar" to the jacket she saw on the man who ran away from the scene (T.II/43,47, S.A. Vol.II/1).

Given this equivocal response, the Commonwealth did not dare ask Dewar whether she could actually identify the green jacket in the courtroom. The other witnesses, Norma Serrano, Helen Fitzpatrick, and John Alves, were never asked to identify the green jacket at all (S.A. Vol.II/1, T.II/30-56, 89-93).

Nor was the green jacket ever tested for gunpowder residue to either confirm or deny the possibility of its use by the shooter. Indeed, this dearth of any identifying evidence mandated the exclusion of the jacket as evidence at the trial (see Petitioner's state-court Brief, S.A. Vol.I/2, pp. 23-24, 33-35).

Moreover, there was no evidence from which to infer that the blood allegedly found on the green jacket was not already on the jacket prior to May 19, 1998, the date of the shooting; in this regard, there concededly was no evidence that the shooter would have bled on the jacket since no one saw any blood on the jacket that day, nor on the path of his flight from the scene (see Petitioner's state-court Brief, S.A. Vol.I/2, pp. 23-24). There was also no evidence that Petitioner had any cuts or scrapes on or about May 19, 1998 -- a fact acknowledged by the SJC in a footnote

7

observing there was no evidence Petitioner received any injury from use of a gun. Commonwealth v. Arroyo, 442 Mass. at 138, fn 2 (see also Petitioner's state-court Brief, S.A. Vol.I/2, pp. 23-24).

For that matter, descriptions of the assailant's jacket varied, with some describing it as green while others said it was blue; the police radio description referred to the jacket as either "green or blue" (T.II/32,37-39,41,46-47,52,62-63,70-72,140, S.A. Vol.II/1; T.III/17, S.A. Vol.II/2).

Likewise, descriptions of the assailant greatly varied, with some witnesses describing him as: (i) "white" while others said he was "possibly Hispanic"; (ii) as short (5'3") or tall (6 feet); (iii) "husky" or "skinny"; (iv) wearing brown corduroys or blue jeans; and, (v) wearing a black baseball cap or nothing at all on his head (T.II/32,37-39,41,46-47,52,62-63,70-72,140, S.A. Vol.II/1; T.III/17, S.A. Vol.II/2).

Nor was there any ballistics testimony connecting the Petitioner to the crime. Although the Commonwealth presented testimony from Carmen Torres -- a person of dubious past and motive (T.III/150-151, S.A. Vol. II/2) -- that the Petitioner owned a 9mm

handgun (T.III/108-110,136,139-140, S.A. Vol.II/2),
*the Commonwealth concededly never presented police or*
*expert ballistician testimony at the trial that the*
*five (5) spent casings recovered at the crime scene*
*were 9mm shells* (T.IV/17-19, S.A. Vol.II/3). Indeed,
the nine millimeter casings found at the scene were
excluded from evidence by the trial judge -- a ruling
which the SJC found fault with, Commonwealth v.
Arroyo, 442 Mass. at 139 fn 5, but obviously could not
change *nunc pro tunc*, nor lawfully rely upon in
upholding Petitioner's conviction.

In sum, Petitioner has demonstrated by clear and
convincing evidence that the SJC's determination
affirming the convictions is "devoid of record support
for its conclusion or is arbitrary," and the AEDPA's
unreasonable application prong has been satisfied.
McCambridge, *supra*, 303 F.3d at 36-37. On this
ground, alone, the conviction must be reversed.

## II. PETITIONER'S FOURTH AMENDMENT CLAIM AS TO THE SEIZURE OF BLOOD FROM HIS PERSON.

Petitioner concedes that his Fourth Amendment
claim regarding the Commonwealth's seizure of a blood
sample from his person is barred from habeas review by
Stone v. Powell, 428 U.S. 465 (1976), as argued by

9

Respondent (R.Mem. 13-15). This claim is withdrawn
and may be dismissed by the Court.

## III. THE SJC'S REJECTION OF PETITIONER'S ARGUMENT CONCERNING THE PROSECUTOR'S BASELESS AND IMPROPER SUMMATION WAS AN UNREASONABLE APPLICATION OF FEDERAL LAW, AND THUS, THE CONVICTIONS VIOLATE DUE PROCESS OF LAW.

Petitioner has raised two claims concerning the
prosecutor's summation, including: (1) improper and
admittedly baseless reference to alleged demographic
statistics; and, (2) improper and admittedly baseless
reference to the murder weapon being a 9mm handgun.
Before reaching the merits of either of these claims,
Respondent maintains that Petitioner's claim
concerning demographic statistics is unexhausted
(R.Mem. 20-23), and that the claim concerning the
model of the handgun is procedurally defaulted (R.Mem.
16-19). For reasons fully set forth below,
Respondent's procedural challenges are baseless, and
its substantive argument on the merits is unpersuasive
and should be rejected by this Court.

### A. *The Claim Concerning Demographic Statistics*

### 1. *Petitioner Has Exhausted His State Remedies*

Although not filing a motion to dismiss the
Petition, Respondent argues in its Memorandum that
Petitioner's claim regarding the prosecutor's improper

10

reference to demographic statistics is "unexhausted"

(see R.Mem. 22-23). To the contrary,

> If, in state court, a petitioner has 1) cited a
> specific constitutional provision, 2) relied on
> federal constitutional precedent, or 3) claimed a
> determinate right that is constitutionally
> protected, he will have employed a mechanism
> which significantly eases any doubt that the
> state courts have been alerted to the federal
> issues.

Nadworny v. Fair, 872 F.2d 1093, 1097 (1st Cir. 1989).

"[A] fourth method by which presentment may be

signaled is where "a petitioner can successfully claim

that he has presented the same legal theory to the

state court [if he] presents the substance of a

federal constitutional claim in such a manner that 'it

must have been likely to alert the court to the

claim's federal nature.'" Nadworny v. Fair, 872 F.2d

at 1097, quoting Dougan v. Ponte, 727 F.2d 199, 201

(1st Cir. 1984). Instructive in this regard is the

Second Circuit's pronouncement in Daye v. Attorney

General of New York, 696 F.2d 186, 194 (2d Cir. 1982):

> The ways in which a state defendant may
> fairly present to the state courts the
> constitutional nature of his claim, even
> without citing chapter and verse of the
> Constitution, include (a) reliance on
> pertinent federal cases employing
> constitutional analysis, (b) reliance on
> state cases employing constitutional
> analysis in like fact situations, (c)
> assertion of the claim in terms so

11

> particular as to call to mind a specific
> right protected by the Constitution, and (d)
> allegation of a pattern of facts that is
> well within the mainstream of constitutional
> litigation.

Applying the above criteria to this case,
Petitioner unquestionably exhausted his due process
claim concerning the prosecutor's baseless reference
to demographic statistics because in his state court
brief (S.A. Vol. I/2), Petitioner: (i) cited the due
process clause of the Fifth and Fourteenth Amendments;
(ii) cited both federal precedent in support of his
due process claim, as well as state precedent which
expressly relied upon federal cases; (iii) claimed a
determinate right that was constitutionally protected;
and, (iv) presented his claim in such a manner that it
must have been likely to alert the court to the
claim's federal nature. Nadworny v. Fair, 872 F.2d at
1097.

First, Petitioner's invocation of the due
process clause and/or the Fifth and Fourteenth
Amendments in connection with the prosecutor's
improper summation appeared throughout the state court
brief (S.A. Vol.I/2), including in the "Issues
Presented" section of the brief (p. 1), the "Summary
of the Argument" section (p. 20), the caption heading

12

to Argument VI (p. 39), and in the text of Argument
VI, itself (p. 48).

Second, Petitioner did, in fact, cite federal
case precedent in his state court brief in support of
his claim, notwithstanding Respondent's contention to
the contrary.  Respondent completely ignores the fact
that Petitioner quoted and relied upon the Supreme
Court's seminal case of Berger v. United States, 295
U.S. 78, 88 (1935) in support of the due process claim
(state court brief, p. 39), a case in which the
defendant's conviction was reversed because the
prosecutor's improper and baseless remarks in
summation were found to violate the fundamental
fairness of the proceedings against the defendant.
Berger is cited and relied upon in federal cases
concerning improper summations which Respondent
concedes would fairly raise the federal issue, see
United States v. Smith, 982 F.2d 681, 684 fn 3 (1st
Cir. 1993); Donnelly v. DeChristoforo, 416 U.S. 637,
649 (1974) (Douglas, J., dissenting) (see R.Mem. 22,
25, referring to Donnelly v. DeChristoforo, supra).

Third, Petitioner relied upon state court
decisions concerning improper summations in his state
court brief which referenced applicable federal law,

which, again, Respondent concedes would fairly raise
the issue, including:  Commonwealth v. Shelley, 374
Mass. 466, 471-472 (1978) (see state court brief, pp.
39, 42, 44, 46), which cites Donnelly v.
DeChristoforo, supra, and Berger, supra; Commonwealth
v. Santiago, 425 Mass. 491, 495 (1997) (state court
brief, p. 45, 47-48), which cites Berger, supra; and,
Commonwealth v. Kozec, 399 Mass. 514, 517 fn 3 (1987)
(state court brief, p. 46, 48), which cites Donnelly
v. DeChristoforo, supra.  See generally Nadworny v.
Fair, 872 F.2d at 1097 (federal constitutional claim
sufficiently exhausted where petitioner relied upon
state decisions in his brief which cited federal law).

        Indeed, Respondent subsequently observes in
discussing the merits of Petitioner's claim that the
factors applied by a federal court in examining a
claim of prosecutorial misconduct are "substantively
identical" to the factors relied upon by the SJC in
reaching its determination (R.Mem. 25).  In light of
this concession, it is difficult to conceive of how
Petitioner's constitutional claim has not been fairly
presented in the state court.  See, e.g., Nadworny v.
Fair, 872 F.2d at 1097 (constitutional claim is
sufficiently exhausted if petitioner can successfully

claim that he presented the same legal theory to the
state court). For that matter, it obviously would be
"futile" for Petitioner to return to state court to
present the same claim anew, and thus, the claim
should be deemed exhausted under the futility
exception as well. Allen v. Attorney General of State
of Maine, 80 F.3d 569, 573 (1st Cir. 1996) (". . .[I]f
a state's highest court has ruled unfavorably on a
claim involving facts and issues materially identical
to those undergirding a federal habeas petition and
there is no plausible reason to believe that a replay
will persuade the court to reverse its field, then the
state judicial process becomes ineffective as a means
of protecting the petitioner's rights").

Finally, Petitioner stated a determinate right
that is constitutionally protected, plainly arguing in
his state court brief that, ". . .The prosecutor's
improper and baseless argument violated state and
federal due process and requires a reversal of the
convictions. . . ." (p. 48' see also, pp. 1,20,39).

In sum, Petitioner's citation to the applicable
amendments of the federal constitution, his reliance
upon federal case precedent and state case precedent
which refers to the applicable federal law, and his

15

plain statement of a determinate right that was
constitutionally protected, and yet, violated, ". . .
must have been likely to alert the court to the
claim's federal nature." Nadworny v. Fair, 872 F.2d
at 1097. Accordingly, Petitioner's constitutional
claim has been sufficiently exhausted in the state
courts, and Respondent's challenge on this ground
should be rejected. Nadworny v. Fair, 872 F.2d at
1097 (constitutional claims sufficiently exhausted);
*accord* Lanigan v. Maloney, 853 F.2d 40, 44 (1st Cir.
1988); Brown v. Streeter, 649 F.Supp. 1554 (D.Mass.
1986).

## B. *The Merits Of Petitioner's Claim Concerning The Handgun Should Also Be Considered.*

Respondent urges this Court to ignore the merits
of Petitioner's claim concerning the prosecutor's
baseless reference to the model of the handgun on the
ground that it was not objected to at the state trial,
and thus, is procedurally defaulted (R.Mem. 15-20).
*See generally* Coleman v. Thompson, 501 U.S. 722, 729
(1991). Respondent acknowledges, however, that review
of a procedurally defaulted claim is permitted if
there is a showing of: (1) cause and prejudice from
the default, i.e., ineffective assistance of counsel

16

in failing to object; or, (2) a miscarriage of

justice. Harris v. Reed, 489 U.S. 255, 262 (1989);

Coleman v. Thompson, 501 U.S. at 729; Burks v. DuBois,

55 F.3d 712, 717 (1st Cir. 1995). The "miscarriage of

justice" exception additionally requires a showing of

actual innocence. Burks, *supra*, 55 F.3d at 717.

Here, Respondent glosses over the fact that the

Petitioner, in his state court brief, did indeed argue

that counsel's failure to object was not "tactical"

and deprived him of the effective assistance of

counsel, citing Strickland v. Washington, 466 U.S. 688

(1984) (*see* state court brief, p. 46, S.A. Vol.I/2).

Prejudice from counsel's oversight is readily

apparent. As more fully set forth in the merits

section of this Argument, *infra*, as a result of

counsel's failure to object, the prosecutor improperly

connected Petitioner to the crime in the eyes of the

jury by first arguing, based upon Carmen Torres's

testimony, that Petitioner owned a 9mm handgun, and

then unfairly claiming that the murder weapon was also

a 9mm handgun -- even though the Commonwealth

concededly never presented any evidence that the

murder weapon was, in fact, a 9mm handgun.

Moreover, the dearth of any evidence

17

establishing Petitioner's guilt, as fully established
in Argument I, above, may establish Petitioner's
actual innocence and that a "miscarriage of justice"
will result if the conviction is upheld, as fully set
forth in the merits section of this Argument, *infra*.
On this ground, too, a review of the merits of
Petitioner's claim is available.

Thus, the Court should reach the merits of
Petitioner's claim.

### C. *Petitioner's Claim Is Meritorious*

The prosecutor "may strike hard blows, [but] he
is not at liberty to strike foul ones. It is as much
his duty to refrain from improper methods calculated
to produce a wrongful conviction as it is to use every
legitimate means to bring about a just one." Berger
v. United States, 295 U.S. 78, 88 (1935).

In considering the merits of Petitioner's
claim, the "relevant question is whether the
prosecutor's comments 'so infected the trial with
unfairness as to make the resulting conviction a
denial of due process.'" Darden v. Wainright, 477
U.S. 168, 181 (1986), quoting Donnelly v.
DeChristoforo, 416 U.S. 637, 643 (1974).

Here, the SJC analysis of Petitioner's claim
was an unreasonable application of the applicable
federal law to the facts of Petitioner's case.
Williams v. Taylor, *supra*, 529 U.S. at 413.

In commenting upon the Petitioner's DNA profile
in connection with the green jacket, the prosecutor
made the following prejudicial comments not based upon
any evidence adduced at trial. *See, e.g.,* United
States v. Smith, 982 F.2d 681, 682 (1st Cir. 1993)
(improper for prosecutor to refer to or rely upon
matters not in evidence). The prosecutor stated:

> There is no disputing the blood on the
> jacket fits the defendant's DNA profile.
> The profile is very rare, as well. If you
> look at Mr. Arroyo as white, the profile
> shows that DNA profile only occurs once in
> every 75,000 people. If you look at
> Southeastern Hispanic, the numbers are even
> higher. One out of 81,000 people.
>
> *Now, let's assume, --look at the number of*
> *people who live in Boston. Six hundred*
> *thousand people or so, give or take. Let's*
> *assume there are eight white people with*
> *that DNA profile, given those numbers. We*
> *assume half the people in Boston are white.*
> *Eight.*
>
> *What else can we assume about that general*
> *population of people in Boston who are white*
> *and have that DNA profile? How many guys*
> *fit that profile?* Well, forget about the
> black guys, ladies and gentleman, because
> the shooter wasn't black. The shooter's
> description isn't black according to any

19

reliable witness in this case. So forget
that part. Forget that number.

*Light-skinned Hispanic. A man. Half the
people in the general population are not
men. So, from that eight or so people, cut
it down to four. How many of the people in
the general population with that profile are
likely to be sixteen to twenty-one years
old, young looking? You've got to lose at
least one or two guys right there. How many
people are left that fit the description of
the shooter and can possibly have the
defendant's DNA profile? Aren't we getting
down to one, light-skinned; height, five-
three, five-six, shorter than average?*

*How many people are left? I suggest to you,
ladies and gentlemen, the only one left is
this man right here, that it's his blood on
the jacket. Based on the DNA evidence and
the description of the shooter, there is
only one person left, the defendant.*

(T.V/68-69, S.A. Vol.II/4) (emphasis added).

At the conclusion of the prosecutor's summation,

defense counsel forcefully objected to this portion of

the closing argument because no demographic evidence

was introduced to establish the population of Boston

(T.V/77-78), much less the number of men versus women

in the general population, the number of Hispanic men

between the ages of sixteen and twenty-one, etc. The

trial court agreed with the defense objection

(T.V/78), and instructed the jury to disregard the

prosecutor's comment:

20

> . . .I just want to tell you that that
> portion of the Commonwealth's closing
> statement that referred to the population
> size of the City of Boston and what can be
> extrapolated from that is stricken from the
> record.  You are to disregard that in
> deciding the issues in this case, because
> there is no evidence about what the
> population of the City of Boston is
> presented in this case.

(T.V/79).

Despite the trial court's curative instruction,
a reversal was required.  The remarks were flagrant,
not based on any evidence, and were especially
prejudicial, zeroing in on the Petitioner as the "only
one left" who could have committed the crime.  The
prosecutor's closing argument created substantial
error which could not be fixed by a curative
instruction, and 'so infected the trial with
unfairness as to make the resulting conviction a
denial of due process.'"  Darden v. Wainright, 477
U.S. 168, 181 (1986), quoting Donnelly v.
DeChristoforo, 416 U.S. at 643.

Equally pernicious, the prosecutor improperly
argued on two (2) separate occasions that the gun used
in the murder was a 9mm handgun -- *even though there
was no evidentiary basis to do so*.  First, the
prosecutor argued:

21

> At some point that morning she [Carmen
> Torres] sees a gun on him.  She sees a gun
> on him at the bus stop.  She saw a gun on
> the defendant, "Pitbull", on Sunday as well.
> She talked to him about the gun on Sunday.
> He had the gun at her house. She described
> it as a 9mm gun because that's what he told
> her it was.  It's color he describes to you.
> *What kind of gun is used in the murder?  A
> 9mm.*

(T.V/57-58, S.A. Vol.II/4)(emphasis added).

Subsequently, the prosecutor again argued, "The

defendant had the means to do the crime.  He had a

gun, *the same type of gun that was used in the crime,

the 9mm*" (T.V/70) (emphasis added) (S.A. Vol. II/4).

As previously established in Argument I, *supra*,

*the Commonwealth failed to present any evidence from

its twenty-seven (27) witnesses that the five (5)

spent bullet casings recovered from the crime scene

were shot from a 9mm weapon.*  In particular, the

Commonwealth never presented police or expert

ballistician testimony at the trial that the five (5)

spent casings recovered at the crime scene were 9mm

shells.  *Detective Mark Vickers, the Commonwealth's

ballistician, was never asked and never testified to

the caliber of the weapon which fired the five (5)

spent shells* (T.IV/17-19).  Thus, there was no factual

basis whatsoever for the prosecutor to twice argue

that the gun used in the murder was a 9 mm handgun. Arguments that are unsupported by the evidence and thus are speculative and conjectural are, of course, improper. United States v. Smith, supra, at 682.

The baseless argumentation in the present case was especially prejudicial and mandates reversal. Defense counsel admittedly did not object to the offending argumentation concerning the handgun. Petitioner was obviously prejudiced by such omission. Strickland v. Washington, *supra*. Lacking any identification of the Petitioner at the scene, the prosecutor improperly connected Petitioner to the crime by first arguing, based upon Carmen Torres's testimony, that Petitioner owned a 9mm handgun, and then claiming, without *any* evidentiary support, that the murder weapon was also a 9mm handgun.

In rejecting Petitioner's argument that the prosecutor's summation was improper and violated due process, the SJC did find that the prosecutor twice deliberately referred to matters not in evidence, including the prosecutor's demographic references and his assertion that a nine millimeter handgun was the murder weapon. Nevertheless, the SJC went on to affirm Petitioner's conviction, holding that the

misstatements were not so prejudicial as to require
reversal.

With respect to the demographic references,
the SJC applied the four-part test set forth in
Commonwealth v. Kater, 432 Mass. 4044, 422-423 (2000),
including: (1) whether the defendant seasonably
objected; (2) whether the error was limited to
collateral issues or went to the heart of the case;
(3) what specific or general instructions the judge
gave to the jury which may have mitigated the mistake;
and, (4) whether the error, in the circumstances,
possibly made a difference in the jury's conclusions.
This test, Respondent maintains (R.Mem. 25), is in
substantial accord with its federal counterpart
articulated in United States v. Rodriquez-DeJesus, 211
F.3d 482, 485 (1st Cir. 2000), discussing: (1) the
severity of the misconduct; (2) the contest in which
it occurred; (3) whether the judge gave curative
instructions; and (4) the strength of the evidence
against the defendant.

In affirming the conviction, the SJC
acknowledged that Arroyo had objected to the improper
statements and that the remarks went to the heart of
the Commonwealth's case; nevertheless, the court held

24

that the trial court's curative instruction "augers

for the Commonwealth" and finally held,

> . . .the fourth factor [i.e., whether the
> error "possibly" made a difference]] is
> determinative. Although the expert's
> testimony did not establish to a certainty
> that Arroyo was the source of the bloodstain
> on the green jacket, it did support a strong
> inference that he was. Considered in
> conjunction with the rest of the evidence, we
> cannot say that the Commonwealth's error,
> particularly after the judge's curative
> instruction, made a difference in the jury's
> conclusions. . . .

Commonwealth v. Arroyo, 442 Mass. at 148.

The SJC's decision upholding the conviction

constitutes an unreasonable application of the law to

the facts of Petitioner's case because it relies upon

the very piece of evidence whose significance the

prosecutor intentionally overstated in his summation.

The prosecutor argued that the Petitioner "must be the

one" because no other Hispanic in the Boston area had

the same DNA profile as that found on the green

jacket. This deliberate misstatement of evidence --

unfairly attributing qualities to the DNA evidence

which could not be found in the record -- might very

well have made a difference in the jury's conclusions

because the evidence was otherwise far from

overwhelming, if not weak and legally insufficient
(see Argument I, supra).

Nor could the trial court's curative
instruction "unring" the bell which had been "rung" in
the courtroom. The prosecutor's point had been made
in front of the jury, albeit an entirely baseless and
improper one. The SJC entirely overlooked the
Petitioner's claim that the prosecutor's closing
argument created substantial error which could not be
fixed by a curative instruction.

Nor did the SJC consider and discuss the impact
of the above-enumerated error in conjunction with the
prosecutor's concededly baseless remark that a nine
millimeter gun was used in the crime. The SJC
acknowledged that "the Commonwealth's error was to
suggest that there was direct evidence that the
victims were shot with a nine millimeter weapon, thus
making it more likely that Arroyo, who had a nine
millimeter handgun was the shooter." Commonwealth v.
Arroyo, 442 Mass. at 148. It then went on to find,
however, that there was "no need for such evidence";
that the jury could otherwise have inferred
Petitioner's use of a nine millimeter weapon from the
record evidence; and, that the rest of the evidence

supporting Petitioner's guilt, including his statements and the evidence linking him to the green jacket, was otherwise sufficient to conclude that, "absent the error, the jury verdicts would have been the same." *Id*.

Again, the SJC's conclusion is unsupported and erroneous. Petitioner's whole point on appeal was that the admitted *lack* of any evidence that a nine millimeter handgun was used as the murder weapon otherwise *negated* and rendered meaningless other evidence that the Petitioner allegedly possessed a nine millimeter handgun and could have been the shooter. The prosecutor's second, intentional misstatement -- for which no curative instruction was given -- also went to the heart of the Commonwealth's case and was used to shore up a weak and entirely circumstantial case.

In sum, the cumulative impact of these misstatements by the prosecutor undoubtedly influenced the jury's decision to convict. Petitioner has been "grievously wronged," Chapman v. California, 386 U.S. 18, 24 (1967), by the prosecutor's deliberate misstatements of evidence: the jury undoubtedly, and unfairly, concluded that Petitioner was the shooter

based upon the prosecutor's baseless comments that the
demographic "evidence" pointed to that inescapable
conclusion, and, that a nine millimeter handgun was
the murder weapon. The prosecutor's improper and
baseless argument, "'so infected the trial with
unfairness as to make the resulting conviction a
denial of due process.'" Darden v. Wainright, 477
U.S. at 181, quoting Donnelly v. DeChristoforo, 416
U.S. at 643.

IV. **PETITIONER'S CLAIM THAT THE STATE COURT ADMITTED
EXPERT WITNESS TESTIMONY CONCERNING PREJUDICIAL
DNA BLOOD EVIDENCE WITHOUT FIRST CONDUCTING A
*DAUBERT* HEARING IS NOT BARRED FROM HABEAS REVIEW
ON THE GROUND OF PROCEDURAL DEFAULT.**

To ensure the reliability of DNA test results as
a matter of due process, a trial judge, *sua sponte*,
must conduct a hearing in the first instance and make
a threshold inquiry concerning the reliability of the
testing procedures before submitting such evidence to
the jury. Daubert v. Merrell Dow Pharmaceuticals,
Inc., 509 U.S. 579 (1993). Here, the state trial
court erred badly by failing to conduct a preliminary
hearing, *sua sponte*, concerning the reliability of the
testimony of the Commonwealth's expert witness, Joseph
Valaro, of the Boston Crime Laboratory, concerning
PCR-based DNA testing which was conducted on a blood

sample taken from the green jacket, recovered by police, and compared by Valaro to DNA samples from the Petitioner and from the victim, Luis Rivera (T.IV/83-88, S.A. Vol.II/3). Although Rivera was excluded as the source of the blood, the Petitioner was allegedly not excluded and was a possible source of the blood on the jacket (T.IV/85-87,92).

Respondent nonetheless argues that this claim is procedurally defaulted because of trial counsel's failure to object at the trial, and thus, is not entitled to habeas review (R.Mem. 15-20). Respondent once again glosses over the fact that the Petitioner, in his state court brief, argued that counsel's failure to object deprived him of the effective assistance of counsel, citing Strickland v. Washington, 466 U.S. 688 (1984) (see state court brief, p. 38, S.A. Vol.I/2), thereby permitting habeas review of his claim. Coleman v. Thompson, 501 U.S. at 729.

Finally, prejudice from counsel's oversight is readily apparent because the reliability of Valaro's expert witness testimony (and the DNA test results upon which it was based) was never established before its submission to the jury, including whether: (i)

reliable and proper testing procedures were employed;

(ii) proper protocol at the laboratory was established

and followed; (iii) extraneous facts or data relied

upon by Valaro were of the type reasonably relied upon

by experts in the field; and/or (iv) whether Valaro's

statistical analysis was based upon generally accepted

DNA testing in the scientific community.

## CONCLUSION

For the above-stated reasons, this Honorable

Court should grant the petition for habeas corpus.

By his attorney,

Donald A. Harwood, Esq.
305 Broadway
New York, NY  10007
(212) 822-1400
BBO# 225110

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the attached
documents was served upon Susanne G. Reardon,
Assistant Attorney General, One Ashburton Place,
Boston, MA 02108, by first class mail, postage
prepaid, on September 9, 2005.

DONALD A. HARWOOD